915 P.2d 1232

## U S WEST COMMUNICATIONS, INC., a Colorado corporation, Appellant,

v.

## The ARIZONA CORPORATION COMMISSION, Appellee.

### No. 1 CA–CC 95–0001.

Court of Appeals of Arizona, Division 1, Department C.

Feb. 8, 1996.

Reconsideration Denied April 12, 1996.

---

U S West Law Department by Gary L. Lane, Fennemore Craig, P.C. by Timothy Berg, Phoenix, for Appellant.

1. US West's test year ended March 31, 1993.

Arizona Corporation Commission, Legal Division by Christopher C. Kempley and Bradford A. Borman, Phoenix, for Appellee.

## OPINION

FIDEL, Judge.

U S West Communications, Inc. ("US West") appeals from Decision No. 58927 of the Arizona Corporation Commission ("the Commission") establishing the telephone rates that US West may charge its Arizona customers. US West argues that the Commission unreasonably and unlawfully (1) imputed to US West an excessive amount of operating income for directory revenues that a related company earned, (2) disallowed a portion of US West's lease expenses, and (3) disallowed a transition cost adjustment to cover US West's change from cash to accrual accounting for non-pension retirement benefits. We find error on the first ground and none on the latter grounds.

## BACKGROUND

US West, a public service corporation that provides telecommunication services, applied to the Commission on July 15, 1993, for permission to increase its Arizona rates. Following extensive proceedings, the Commission determined US West's revenue requirement based on its reasonable test-year [1] operating costs and its fair value rate base.[2] The Commission then set rates intended to cover US West's reasonable operating costs and provide its shareholders a 7.61 percent rate of return. *See Scates v. Arizona Corp. Comm'n,* 118 Ariz. 531, 534, 578 P.2d 612, 615 (App.1978). The new rates became effective January 16, 1995.

US West filed this appeal pursuant to Arizona Revised Statutes Annotated ("A.R.S.") § 40–254.01, which provides for an expedited direct appeal to this court from Commission orders relating to rate making or design. The statute does not provide for *de novo* review. *Consolidated Water Utils., Ltd. v. Arizona Corp. Comm'n,* 178 Ariz. 478, 481, 875 P.2d 137, 140 (App.1993). US West

2. US West's fair value rate base is the fair value of its property used to provide telephone service to Arizona customers. Ariz. Const. art. 15, § 14.

"must make a clear and satisfactory showing that the [Commission's] order is unlawful or unreasonable." A.R.S. § 40–254.01(E).

## DIRECTORY REVENUE IMPUTATION

US West first argues that the Commission erred when it imputed operating income revenue of $60,684,000 to US West based on the allegedly excess revenue earned by an affiliate, U S West Direct (USWD). US West proposed in its rate application, and agrees on appeal, that $43 million of USWD's profits should be imputed as income; it argues that the Commission's larger imputation violated the terms of the Commission's 1988 settlement agreement with US West's predecessor, Mountain Bell, in which the Commission accepted USWD's spin-off as a separate, unregulated entity.

In recommending an imputation of $60,-684,000, the Commission staff attributed to US West all USWD profits that exceeded the 11.4 percent rate of return that would have been permitted had USWD remained a regulated entity. Staff explained, "The intent [of the adjustment] is to provide ratepayers the same benefit from the directory publishing business as they had before the assets were transferred." The Commission adopted this rationale. We consider whether, in so doing, the Commission violated the terms of the 1988 settlement agreement.

At the outset of the inquiry, we must address the Commission's argument that we should defer to its interpretation of the settlement agreement. The purpose of contract interpretation is to determine and enforce the parties' intent. *Taylor v. State Farm Mut. Auto. Ins. Co.,* 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993). Determining the intent of contracting parties may require fact finding, but "[w]hether contract language is reasonably susceptible to more than one interpretation so that extrinsic evidence is ad-

missible is a question of law for the court." *Id.* at 158–59, 854 P.2d at 1144–45. Although the Commission staff offered evidence to support its view that the methodology used to determine the $60,684,000 imputation was consistent with the settlement agreement, the agreement contained no language to support the Commission's interpretation, and the meaning of the contract must be determined as a matter of law. *See Maxwell v. Fidelity Fin. Servs.,* 184 Ariz. 82, 907 P.2d 51, 62 (1995). Because interpreting the agreement is a question of law for the court and not a discretionary matter constitutionally entrusted to the Commission, we owe no deference to the Commission's interpretation.

The seeds of this dispute were sown when, in the course of the reorganization of AT & T, Mountain Bell, US West's predecessor, was separated from AT & T and was assigned the assets used to publish regional yellow and white page directories. *See United States v. AT & T,* 552 F.Supp. 131, 193–95, and 200–01 (D.D.C.1982), *aff'd sub nom Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). Mountain Bell transferred these assets to USWD, a subsidiary of Mountain Bell's parent company, U S West, Inc. ("USWI"). The Commission objected and, in October 1987, declared the transfer of directory publishing assets void because of Mountain Bell's failure to comply with A.R.S. § 40–285.[3] Mountain Bell filed an action in superior court challenging this decision; the Commission and Mountain Bell settled the matter in May of 1988.

Under the terms of the settlement, the Commission agreed to "take no further action to challenge" Mountain Bell's transfer of yellow pages assets to USWD. The parties also agreed:

> the performance of its duties to the public, or any franchise or permit or any right thereunder, nor shall such corporation merge such system or any part thereof with any other public service corporation without first having secured from the commission an order authorizing it so to do. Every such disposition, encumbrance or merger made other than in accordance with the order of the commission authorizing it is void.

**3.** A.R.S. § 40–285(A) provides:

> Disposition of plant by public service corporations; acquisition of capital stock of public service corporation by other public service corporations
>
> A. A public service corporation shall not sell, lease, assign, mortgage or otherwise dispose of or encumber the whole or any part of its railroad, line, plant, or system necessary or useful in

That included in Mountain Bell's 1984 rate case (which is the basis for rates currently charged the ratepayers) were the fees received from USWD under publishing agreements with USWD; that in future rate cases filed by Mountain Bell, the Commission, in arriving at the test year operating income of Mountain Bell, will consider the fees and the value of services received by Mountain Bell from USWD under publishing agreements with USWD; that Mountain Bell and the Commission Staff may present evidence in support of or in contradiction to those fees and the value of those services. Mountain Bell and the Commission agree that in subsequent rate cases downward adjustments from the $43 million in fees received by Mountain Bell from USWD and included in Mountain Bell's 1984 rate case will require more than a showing by Mountain Bell that it negotiated a lesser amount with USWD.

 US West argues that the Commission has violated the settlement agreement by treating USWD's assets as if they were still a part of the regulated utility, rather than calculating the imputed income in terms of the fees and value of services US West receives. We agree. The Commission unequivocally agreed in 1988 to accept the transfer of directory publication to an unregulated subsidiary. It is wholly inconsistent with this agreement to impute to US West all of USWD's profits exceeding the rate of return USWD would have been permitted to receive had it remained regulated and to seek thereby for "ratepayers the same benefit from the directory publishing business as they had before the assets were transferred." By such a methodology the Commission in effect pretends that the transfer it previously accepted did not occur.

The imputation method approved in the agreement was not the excess-profit imputation adopted by the Commission but rather a method dependent upon proof of "the fees and the value of services received by Mountain Bell from USWD under publishing agreements with USWD." During oral argument, the parties agreed that an appropriate imputation of fees and value of services was $43 million. And the parties jointly interpret the agreement as providing for a presumptive imputation of $43 million in subsequent rate cases. The parties disagree, however, whether this presumptive figure may be adjusted upward or downward, as the Commission maintains, or only downward, as US West maintains.

The disputed provision is this:

Mountain Bell and the Commission agree that in subsequent rate cases downward adjustments from the $43 million in fees received by Mountain Bell from USWD and included in Mountain Bell's 1984 rate case will require more than a showing by Mountain Bell that it negotiated a lesser amount with USWD.

US West argues that the quoted language sets a $43 million cap on imputed income because only downward adjustments are mentioned. We reject this interpretation. The agreement merely indicates one particular factor—Mountain Bell's negotiation of a lesser amount with USWD—that will not suffice alone to warrant a downward adjustment; it singles out no factors that will not suffice alone to warrant an upward adjustment. The apparent purpose of the disputed provision is to preclude US West and USWD from assigning an artificial value to fees and services and thereby preempting the Commission's independent assessment. The agreement authorizes the Commission staff to "present evidence in support of or in contradiction to" whatever value US West and USWD might assign to fees and services, and it entitles the Commission to adjust the presumptive $43 million imputation either upward or downward as the evidence of fees and services supports.

In this case, however, the Commission did not rely on evidence of the value of fees and services; nor did the staff submit any evidence that USWD's fees and services to US West in the base year were of a value greater than the $43 million that US West accepts as the presumptive imputation. Accordingly, because the Commission relied on a methodology that its 1988 agreement renders invalid, and because the staff introduced no evidence that would support a greater imputation under the proper methodology, we set aside the Commission's

greater imputation and direct it on remand to impute only $43 million of directory revenue.

## DISALLOWANCE OF LEASE EXPENSES

■ We next consider US West's argument that no substantial evidence supports the Commission's disallowance of $2,710,816 of test-year lease expenses.

Shortly after the breakup of AT & T, USWI, US West's parent company, created a real estate development subsidiary, BetaWest Properties, to handle the real estate needs of USWI and its affiliates. As part of its development strategy, USWI moved Mountain Bell (later US West) from Class B and C office buildings to more expensive Class A office buildings owned by USWI. In 1989–90, during the extended local real estate depression, USWI changed its strategy, dissolved BetaWest, transferred its assets to a new company, U S West Real Estate, Inc., and sold a number of properties occupied by and subject to long-term leases with US West.

In a lengthy report, an investigative team hired by the Commission staff concluded that US West's lease expenses were substantially too high. After considering that report and US West's rebuttal, the Commission allowed US West all the operating expenses related to its lease expenses. It then adopted its staff's recommendation and found that US West's test-year lease expenses were 50 percent too high. This finding would have supported a disallowance of $5,421,633, but the Commission also found that US West's shareholders and customers shared the benefits of US West's centrally located, consolidated, Class A office space. So that the shareholders and customers might likewise share the burdens, the Commission halved the disallowance to $2,710,816.

US West claims on appeal that the investigative report the Commission relied on was not substantial evidence but rather an exercise in hindsight that failed to assess properly the reasonableness of US West's real estate leasing decisions at the time they were made. See A.A.C. R14–2–103(A)(3)(1) (The

prudence of expenditures must be "viewed in the light of all relevant conditions known or which in the exercise of reasonable judgment should have been known, at the time such [expenditures] were made.").

We disagree that the Commission based its decision on hindsight. The investigative report permitted the Commission to conclude that *at the time* crucial leasing decisions were made—the mid–1980s, when USWI moved Mountain Bell from Class B and C office buildings to expensive Class A buildings owned by USWI—adequate alternatives were available at lower cost. The report looked at the space other large corporate clients leased in the mid–1980s and concluded that similar, less expensive space was then available to US West, making the move imprudent from US West's, if not USWI's, point of view. The investigators concluded that, as early as the mid–1980s, US West should have recognized and pursued more cost-effective alternatives. This substantial evidence supports the Commission's decision.

■ The Commission has broad powers to scrutinize transactions between a regulated company and its unregulated affiliates. See *Arizona Corp. Comm'n v. State ex rel. Woods,* 171 Ariz. 286, 830 P.2d 807 (1992); Lee R. Russ, Annot., *Amount Paid by Public Utility to Affiliate for Goods and Services as Includable in Utility's Rate Base and Operating Expenses in Rate Proceeding,* 16 A.L.R.4th 454 (1982). The Commission also has the power to disallow excessive lease payments, especially those made to an affiliate. *Cf., e.g., U S West Communications, Inc. v. Public Serv. Comm'n,* 901 P.2d 270, 275 (Utah 1995) (upholding conclusion that above-market rental payments to affiliate could be disallowed). Because there was substantial evidence to support the Commission's disallowance of lease expenses, we will not disturb this part of its decision.

## CASH OR ACCRUAL ACCOUNTING

■ Finally, US West argues that the Commission erred in refusing to recognize for ratemaking purposes US West's accounting change from a cash to an accrual basis for employee post-retirement benefits other

than pension and life insurance ("OPEBs").[4] In the past, both US West and the Commission have reflected OPEBs as they are paid, not as they accrue, as costs to be recovered in current rates. In keeping with recently adopted accounting standards, however, US West has now changed to accrual basis accounting and appeals from the Commission's refusal to follow suit.

The advantages of accrual accounting over cost accounting are these: (1) OPEB costs will increase substantially as the number of retirees increase in coming years; (2) continued cost accounting for OPEBs will predictably subject future US West customers to substantial rate increases to cover substantially higher future OPEB costs; (3) by shifting to accrual accounting, US West has established interest-earning OPEB trust accounts that will reduce such future costs and the associated intergenerational inequity.

The Commission does not dispute that, for these reasons, accrual accounting may better match costs and benefits and be fairer to future generations. It has declined to adopt accrual accounting, however, because the change entails more than $28 million in transition costs, which the Commission is unwilling to assign to present ratepayers.

US West attacks the Commission's decision on the ground that it violates the Arizona constitutional requirement that

> The Corporation Commission shall ... make and enforce reasonable rules, regulations, and orders for the convenience, comfort, and safety, and the preservation of the health, of the employees and patrons of [public service corporations].

Ariz. Const. art. 15, § 3. We find no constitutional violation. US West may be correct when it argues that external trust funds established through accrual accounting would better enable it to cover the future OPEB costs. But the Commission has historically provided for OPEBs as they come due and has stated its intention to continue to do so in the future. Thus, whatever the fiscal prudence of the Commission's chosen method, there is no current basis for a finding that the Commission is now neglecting, or plans in the future to neglect, its responsibilities to the company's employees under article 15, section 3.

US West also argues that the Commission's disallowance of the adjustment for its OPEB expenses was arbitrary, unreasonable, and unsupported by substantial evidence. Again we disagree. US West essentially attacks the long-range fiscal prudence of the Commission's decision, and we will not subordinate the Commission's fiscal judgment to our own. Whether to subject present ratepayers to the substantial cost of transition to accrual accounting or to subject future ratepayers to the foreseeably increasing costs of cost accounting is uniquely a policy decision, constitutionally entrusted to the Commission, and not one that the courts have authority to preempt. Article 15, section 3, of the Arizona Constitution provides:

> The Corporation Commission shall ... make reasonable rules, regulations, and orders, by which [public service] corporations shall be governed in the transaction of business within the State, *and may prescribe* the forms of contracts and *the systems of keeping accounts* to be used by such corporations in transacting such business.

(Emphasis added.) We defer to the Commission's constitutionally granted power to determine appropriate "systems of keeping accounts."

## CONCLUSION

For the foregoing reasons, we affirm the Commission's handling of real estate expenses and OPEB accounting, reverse the Commission's imputation of directory revenue greater than $43 million, and remand to the Commission for proceedings consistent with this decision.

VOSS, P.J., and TOCI, J., concur.

4. Because the Company and the Commission already account for retirees' pension and life insurance benefits on an accrual basis, these benefits are not at issue in this appeal.