22 P.3d 905

**ARIZONA CONSUMERS COUNCIL,**
Appellant,

v.

The **ARIZONA CORPORATION COM-
MISSION,** an agency of the State
of Arizona, Appellee,

and

Arizona Public Service Company; Resi-
dential Utility Consumer Office; Tucson
Electric Power Company, Appellees–In-
tervenors.

No. 1 CA–CC 99–0006.

Court of Appeals of Arizona,
Division 1, Department B.

April 5, 2001.

Arizona Center for Law in the Public Interest, by Timothy M. Hogan, Jennifer B. Anderson, Tina A. Calos, Phoenix, Attorneys for Appellant.

Arizona Corporation Commission Legal Division, by Janet Wagner, Janice M. Alward, Phoenix, Attorneys for Appellee.

Snell & Wilmer, L.L.P., by Steven M. Wheeler, Martha E. Gibbs, Jeffrey B. Guldner, Phoenix, Attorneys for Appellee–Intervenor, Arizona Public Service Company.

Residential Utility Consumer Office (RUCO), Legal Department, by Scott S. Wakefield, Jessica Carpenter, Phoenix, Attorneys for Appellee–Intervenor, RUCO.

Roshka, Heyman & DeWulf, PLC, by Raymond S. Heyman, Randall H. Warner, Phoenix, Attorneys for Appellee–Intervenor, Tucson Electric.

Fennemore Craig, by C. Webb Crockett, Jay L. Shapiro, Karen E. Errant, Phoenix, Attorneys for Amicus Curiae Phelps Dodge.

## OPINION

WEISBERG, Judge

¶1 Arizona Consumers Council ("Council")[1] challenges the decision of the Corporation Commission ("Commission") approving a settlement agreement among Arizona Public Service Company ("APS") and a number of APS's major customer groups. The Council argues that (1) the rates established by the agreement were not set in accordance with Arizona constitutional requirements; (2) the rates did not take into account the divestiture of APS's generation assets; (3) the Commission improperly approved an adjustment mechanism that would allow APS to recover future costs; and (4) the Commission abdicated its constitutional rate making authority by becoming a party to the agreement. We, however, affirm the Commission's decision.

## FACTS

¶2 In December 1996, the Commission adopted rules outlining a framework for the introduction of retail electric competition in Arizona. Traditionally, all components of electric service were "bundled"—that is, provided to the customer as a package under one rate by one regulated utility. Ariz. Admin. Code ("A.A.C.") R14–2–1601(5). Under the new rules, electricity generation, metering, and billing would become competitive, and customers could choose to obtain these services from electric service providers ("ESPs") rather than from the incumbent utility. A.A.C. R14–2–1601(7). Transmission and distribution of electricity would remain noncompetitive and would continue to be provided to all users by the incumbent utility. A.A.C. R14–2–1601(29), (45). However, customers could also choose to continue to receive electric service as they always had—as a bundled service provided by the incumbent utility at regulated rates. A.A.C. R14–2–1601(38); R14–2–1606(A). Such service, called "Standard Offer Service," would be deemed non-competitive. A.A.C. R14–2–1606(A).

¶3 In May 1999, APS filed an application with the Commission for approval of a settlement agreement among APS and a number of its customer advocate groups. The agreement addressed various issues related to the introduction of competition. In addition to APS, the signatories included the Residential Utility Consumer Office,[2] the Arizona Com-

---

1. The Arizona Consumers Council is a non-profit organization dedicated to protecting the interests of consumers.

2. The Residential Utility Consumer Office, an appellee-intervenor in this appeal, is a state agency charged with representing the interests of residential utility consumers in regulatory proceedings before the Arizona Corporation Com-

munity Action Association,[3] and Arizonans for Electric Choice and Competition.[4] No ESPs signed the agreement.

¶ 4 The Council filed a motion to intervene, which was granted. The Commission conducted a six-day hearing in July 1999. The Commission also accepted pre-filed testimony, written rebuttal testimony, and post-hearing briefs. The Hearing Officer then issued a recommended Opinion and Order, proposing approval of the settlement agreement subject to certain modifications, after which the participants filed exceptions to the proposed order.

¶ 5 Approval of the agreement was also considered at an open meeting, at which the parties offered their comments about the proposed order. The Commission made several modifications to the settlement agreement and then approved the agreement by a vote of two to one. Decision No. 61973 was issued on October 6, 1999.

¶ 6 Under the settlement agreement, as modified by Decision No. 61973, APS's existing rates for bundled service were deemed to be its standard offer rates. The agreement provided for annual reductions of those rates by 1.5 percent for five years.

¶ 7 The agreement also provided that APS could recover $350 million in stranded costs through a competitive transition charge. "Stranded costs" consist of the verifiable net difference between the net original cost of the utility's assets and obligations under traditional regulation and the market value of those same assets and obligations in a competitive marketplace. See A.A.C. R14–2–1601(39)(a). Stranded costs also include costs necessarily associated with the divestiture of generation assets as well as other approved costs of transition to a competitive industry structure. See A.A.C. R14–2–1601(39), (b), (c), (d).

¶ 8 The agreement requires APS to divest its generation assets by December 31, 2002,

and requires the Commission to approve the formation of an APS affiliate to acquire those assets at book value. Furthermore, APS must file a general rate case by June 30, 2003, although rates resulting from that rate case would not become effective before July 1, 2004. The agreement also requires the Commission to approve, before December 31, 2002, an adjustment clause to allow full recovery of certain defined costs, beginning July 1, 2004.

¶ 9 The Council filed an application for rehearing, which was deemed denied as a matter of law. See A.R.S. § 40–253(a). The Council then filed its notice of direct appeal. This court has jurisdiction pursuant to A.R.S. section 40–254.01(A).

## DISCUSSION

¶ 10 To prevail in a direct appeal of a Corporation Commission decision, the appellant must show by clear and convincing evidence that the Commission's action was unlawful or unreasonable. A.R.S. § 40–254.01(E); Consolidated Water Utils., Ltd. v. Arizona Corp. Comm'n, 178 Ariz. 478, 481, 875 P.2d 137, 140 (App.1993). We will not disturb a Commission decision, therefore, unless the appellant demonstrates that the decision is "arbitrary, unlawful, or unsupported by substantial evidence." Litchfield Park Service Co. v. Arizona Corp. Comm'n, 178 Ariz. 431, 434, 874 P.2d 988, 991 (App.1994). Furthermore, this court may not reweigh the evidence and substitute its judgment for that of the Commission. See Tucson Elec. Power Co. v. Arizona Corp. Comm'n, 132 Ariz. 240, 243, 645 P.2d 231, 234 (1982).

### Rate Reductions

¶ 11 Appellant argues that by approving the negotiated rate reductions in the settlement agreement, the Commission failed to comply with its constitutional obligation to set rates based on the fair value of the

mission. Ariz.Rev.Stat. Ann. ("A.R.S.") § 40–463.

3. The Arizona Community Action Association consists of 30 community action agencies and programs in Arizona and represents the interests of low-income Arizonans.

4. Arizonans for Electric Choice and Competition is a coalition of commercial and industrial customers and trade associations that support competition.

utility's property. The Commission and APS both respond that a fair value determination was not necessary and that, even if it were, the Commission conducted the appropriate financial inquiry.

¶ 12 Article 15, section 3 of the Arizona Constitution provides that

[t]he Corporation Commission shall have full power to, and shall, prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the State for service rendered therein. . . .

Section 14 states as follows

The Corporation Commission shall, to aid it in the proper discharge of its duties, ascertain the fair value of the property within the State of every public service corporation doing business therein. . . .

Construed together, these provisions require the Commission, when setting rates, to determine the fair value of the corporation's property in the state and to use that finding as the rate base for calculating just and reasonable rates. *See Simms v. Round Valley Light & Power Co.*, 80 Ariz. 145, 151, 294 P.2d 378, 382 (1956); *Scates v. Arizona Corp. Comm'n*, 118 Ariz. 531, 534, 578 P.2d 612, 615 (App.1978). The rates established should meet the operating costs of the utility and provide a reasonable rate of return. *Scates*, 118 Ariz. at 534, 578 P.2d at 615.

¶ 13 The Council first argues that the decision is flawed because the Commission failed to make a specific finding that the rates established were "just and reasonable." However, the Council cites no authority requiring such a finding, and we agree with the Commission that the lack of such a specific finding does not require reversal if the record otherwise supports the decision, as it does in this instance. *See CAVCO Indus. v. Industrial Comm'n of Arizona*, 129 Ariz. 429, 435, 631 P.2d 1087, 1093 (1981)(Industrial Commission need not set forth separate

findings that lead to determination of ultimate fact so long as ultimate finding is supported by the record). Here, the Commission specifically found that the rates were supported by the financial evidence presented and that the settlement agreement was just and reasonable. In this context, a finding that the rates included in the settlement were just and reasonable is inherent in the Commission's approval of the agreement and the financial data contained therein. The decision, therefore, is not flawed by the lack of a specific "just and reasonable" finding.

¶ 14 The Council next argues that, under the Arizona Constitution, the Commission was required to, but did not, base its approval of the reduction in standard offer rates upon a financial assessment of APS and a determination of the fair value of APS's assets. Both the Commission and APS argue that the Commission need not make a fair value determination to approve a voluntary reduction in rates,[5] but that even if such a finding were required, sufficient evidence was presented to support the Commission's decision.

¶ 15 Article 15, sections 3 and 14 of the Arizona Constitution and the cases interpreting those provisions require the Commission to ascertain the fair value of the utility's property in the state and to establish just and reasonable rates based on that fair value determination. *See Simms*, 80 Ariz. at 151, 294 P.2d at 382; *State v. Tucson Gas, Elec. Light and Power Co.*, 15 Ariz. 294, 303, 138 P. 781, 785 (1914); *U.S. West Communications, Inc. v. Arizona Corp. Comm'n*, 198 Ariz. 208, 212, ¶¶ 22–24, 8 P.3d 396, 404 (App.2000); *Scates*, 118 Ariz. at 534, 578 P.2d at 615. The reasonableness and justness of the rates must be related to the fair value finding. *Simms*, 80 Ariz. at 151, 294 P.2d at 382.

¶ 16 The parties agree that a full rate case did not take place in this case but disagree over whether A.R.S. section 40–250

5. We do not address the Commission's argument that a fair value finding was not necessary to determine stranded costs and unbundled tariffs, nor do we address APS's argument that a fair value finding was not necessary in establishing direct access service rates. The Council has not

challenged the Commission's failure to make a fair value finding with respect to these elements of the decision; the Council's challenge is based on the lack of a fair value finding only with respect to the rate reductions.

requires one when a *reduction* in rates is contemplated. As a fallback position, the Commission and APS assert that sufficient evidence of APS's financial status was presented to support the Commission's decision, which thus could be affirmed on that basis alone. Because we agree with the Commission and APS that sufficient financial evidence was presented to support the Commission's determination in this case,[6] we need not address either whether a full rate case is required when rate reductions are contemplated or whether rates must be based on a finding of fair value when a voluntary reduction in rates is being considered.

¶ 17 In Decision No. 61973, the Commission stated that, based on the evidence presented, APS's fair value rate base was $5,195,675,000 and its fair value rate of return was 6.63 percent. This finding corresponds with calculations provided by APS's witness, Alan Propper, in testimony filed prior to the hearing. Propper, the Director of Pricing and Regulation for APS, testified that the figures were based on *pro forma* adjustments of the company's 1996 data. APS also provided 1998 financial performance data and projections for 1999. APS and the Commission argue, and we agree, that this evidence, along with the financial analysis associated with determining the stranded costs, was sufficient to support the Commission's finding that the settlement agreement was based on a fair value assessment of APS's assets and that the rates adopted pursuant to the agreement were just and reasonable.[7]

¶ 18 Of course, the Arizona Constitution does not prescribe a particular formula for determining a company's fair value rate base. *See Simms*, 80 Ariz. at 151, 294 P.2d at 382. In any case, we defer to the Commission's

discretion in weighing the evidence presented in determining the fair value. *Arizona Corp. Comm'n v. Arizona Water Co.*, 85 Ariz. 198, 202, 335 P.2d 412, 414 (1959). In such situations, we have refrained from finding that the Commission must conduct a full rate proceeding when authorizing a change in rates, recognizing that updating prior submissions may be sufficient. *See Scates*, 118 Ariz. at 537, 578 P.2d at 618.

¶ 19 APS provided the Commission with past, current and projected financial information. In its decision, the Commission specifically found that the formula for rate reductions contained in an APS exhibit provided "current financial support for the proposed rates." [8] That exhibit referred to attachments that included the calculation of the proposed reduction in retail rates and a comparison of present and proposed rates, as well as various documents related to APS compliance with the Commission's 1996 agreement. Based on this record, without reweighing the evidence, we cannot say that there was insufficient evidence on which the Commission based its decision. The Council has therefore failed to show that the Commission's action in approving the agreement and rate base contemplated was "arbitrary, unlawful or unsupported by substantial evidence." *Litchfield Park*, 178 Ariz. at 434, 874 P.2d at 991.

### APS's Divestiture of Assets

¶ 20 Under the approved settlement agreement, APS must divest itself of its generation assets on or before December 31, 2002, and must file a general rate case by June 30, 2003. However, rates established by the rate case would not become effective until July 1, 2004. Except for specific exceptions contained in the agreement, the rates estab-

---

6. This case is thus distinguishable from *U.S. West*, 198 Ariz. 208, 8 P.3d 396, in which the Commission had not considered fair value when setting initial rates for competitor public service corporations.

7. In addition, as the Commission points out, APS is required to file financial performance information with the Commission each year, which the staff routinely reviews for accuracy. The Commission's ongoing familiarity with APS's finan-

cial status thus may also be presumed to have justified the Commission's findings.

8. The exhibit referred to proposed a one-time rate decrease of .68 percent pursuant to a provision in a prior Commission decision, and the cover letter to the exhibit asked the Commission to consider the .68 percent decrease as part of the 1.5 decrease contained in the settlement agreement.

lished by the agreement would remain unchanged until the new rates from the rate case went into effect. The Council therefore argues that, between the date of the actual divestiture of the generation assets and the date the new rates go into effect, customers would be paying APS a return on more than $2 billion in assets that would not then be owned by APS.

¶ 21 A public service corporation is entitled to a "fair return on the fair value of its properties devoted to the public use, no more and no less." *Arizona Water Co.*, 85 Ariz. at 203, 335 P.2d at 415. Furthermore, the corporation is entitled to a reasonable return based upon the fair value of its properties at the time the rates are set. *See Simms*, 80 Ariz. at 153, 294 P.2d at 383.

¶ 22 The Council argues that the Commission should have considered APS's future divestiture of assets as a "known and measurable change" when approving the rates in the settlement agreement. *See Utah Power & Light Co. v. Idaho Public Utils. Comm'n*, 102 Idaho 282, 284, 629 P.2d 678, 680 (1981). "Known and measurable changes" are changes in a company's assets that occur after the end of a test year but *before* rates are set, and that are shown to be reliable and certain. *See id.; Gas Service Co. v. State Corp. Comm'n of Kansas*, 8 Kan.App.2d 545, 662 P.2d 264, 268 (1983). Consequently, although divestiture was mandated by the agreement and the rules, *see* A.A.C. R14–2–1615, it had not yet occurred at the time the agreement was considered and, therefore, was not yet a known, measurable, certain change.

¶ 23 The Council nonetheless argues that, by entering into the agreement, the Commission has essentially foreclosed any change to the established rates before July 2004, except in the event of an "emergency" and that the divested assets must yield an unwarranted return to APS. We, however, conclude that the divestiture of APS's generation assets can have no significant impact on the rates approved.

9. These are the difference between the book value and the market value of the assets. A.A.C.

¶ 24 Under the agreement, APS is to divest its generation assets to an affiliate. The affiliate will receive the assets at the net book value of $2.1 billion. In exchange, APS will receive the market value of $1.6 billion and the value of stranded costs.[9] After divestiture, APS, while lacking generation facilities, will still be required to provide full electric service to its standard offer customers. APS will therefore be required to purchase power for its standard offer customers at market value. Without divestiture, APS's rates would have included the market value of its generation assets and stranded costs; after divestiture, APS's rates will include the costs of purchased power (which are analogous to the market value of the generation assets) and stranded costs (which are analogous to the stranded costs of the generation assets). Thus, APS, in all likelihood, will continue to incur the same costs associated with electricity generation, but from a different source. Because the cost of the generation assets will be replaced by the corresponding expense of purchasing power, rates of return will not be affected significantly.

¶ 25 The Council does not disagree with the validity of the foregoing analysis, but argues instead that whether the cost to APS of purchasing power at market rates will be *more* or *less* expensive than that of producing its own power is unknown, which will affect the resulting rates to some degree. The Commission responds that any issues that may arise regarding significant variations between the market price of purchased power and the cost of power from APS generation assets can be addressed at the hearing in 2002 to establish adjustor mechanisms related to purchased power. However, the Council replies that any such adjustment would constitute "retroactive rate making" and would be impermissible.

¶ 26 Retroactive rate making occurs when the Commission requires refunds of an established, approved rate that is final. *See Pueblo Del Sol Water Co. v. Arizona Corp. Comm'n*, 160 Ariz. 285, 287, 772 P.2d 1138, 1140 (App.1988). APS, however, the entity

R14–2–1601(39).

whose rates would be affected, apparently takes the position in this appeal that the agreement would allow for such adjustments.

■ ¶ 27 The Council understandably points out that, in its posthearing brief, the Commission's staff recommended that the Commission designate APS's rates after divestiture as "interim" rates pending the setting of new rates. The import of this observation is that, had it denominated the rates interim, the Commission later could have ordered refunds to customers in the event of over charges by APS. *See Pueblo Del Sol*, 160 Ariz. at 286–87, 772 P.2d at 1139–40. However, the Commission did not follow its staff's recommendation and did not designate the rates after divestiture as interim. While we agree that the Commission could have avoided this hypothetical problem caused by the timing of the divestiture of APS's assets by designating the rates established as interim after divestiture, its failure to do so does not require reversal.

¶ 28 Under the circumstances presented, where the divestiture, although expected, has not yet occurred; where, arguably, the divestiture will have little effect on rates; and where a mechanism is in place that can resolve any concerns that may arise brought about by the timing of the divestiture; we cannot say that the Council has shown clearly and convincingly that the Commission's decision was unlawful, unreasonable, or unsupported by substantial evidence.

### *Establishment of Adjustment Clause*

¶ 29 Under the settlement agreement, the Commission shall, upon application by APS and after a hearing, approve before December 31, 2002, an adjustment clause that will "provide full and timely recovery beginning July 1, 2004, of the reasonable and prudent costs" of (1) APS's provider-of-last-resort and standard-offer obligations for service after July 1, 2004; (2) standard-offer service to customers who have left standard-offer service and want to return; (3) compliance with the Electric Competition Rules or associated Commission programs or directives related to the implementation of those Rules; and (4) Commission-approved system benefit programs or levels not included in standard-

offer rates as of June 30, 1999, to be recovered from all customers receiving APS service. After this initial approval, APS will file by June 30, 2003, its request for specific adjustment clause factors. After a second hearing and Commission approval, the adjustment clause factors would go into effect July 1, 2004. APS must also file a general rate case by June 30, 2003.

¶ 30 The Council argues that the Commission improperly approved the future adoption of an adjustment clause without conducting the required rate case. The Commission and APS respond that no rate case is necessary to approve an adjustment clause and that the agreement has not actually established such a clause. While the parties take differing positions on this issue, they all agree that the Commission cannot bargain or contract away its constitutional obligations.

■ ¶ 31 In any event, the language of the adjustment clause, as written, is broad and ambiguous, which would render a decision regarding its validity untenable in the absence of any current controversy. For example, as two illustrations of what may constitute an "emergency," section 2.8 of the agreement sets forth such occurrences as "an inability to finance on reasonable terms" and "material changes in APS's cost of service for Commission regulated services" based on "federal, tribal, state or local laws, regulatory requirements, judicial decision, actions or orders." These examples appear to be more in the nature of unforeseen and individual business circumstances rather than more global events—such as a sudden drain in world oil reserves that unexpectedly impacts oil prices—that one normally envisions as an "emergency." Thus under the terms of the adjustment clause, and given the parties' agreement concerning the Commission's role, the clause may be interpreted as permitting the Commission or APS to undertake an action to seek a change in the rates in the event of an "unjust result" vis-a-vis APS (if the rates are too low) or the Commission (if the rates are too high). But we need not reach this issue today because all of the arguments presented are hypothetical and speculative and any concerns regarding the

application of the clause are better addressed in the event an actual controversy arises.

¶ 32 Furthermore, the Council's main concern—that the clause be enacted as part of a rate case—may yet be addressed when the Commission considers the specifics of the proposed adjuster. Although both APS and the Commission contend that the adjustment clause need not be enacted pursuant to a rate case, the agreement requires APS to file a rate case and its request for the specific adjustment factors at about the same time. It is therefore possible that, if and when the Commission establishes the adjustment clause, it may do so as part of the rate case, just as the Council is advocating. However, if the Commission establishes the clause outside the rate case, the Council can re-urge its objection. In any case, because the adjustment clause has not yet been established, any discussion about whether it is unlawful because of the lack of financial inquiry would be premature. *See New York State Elec. & Gas Corp. v. Federal Energy Reg. Comm'n,* 177 F.3d 1037, 1040 (D.C.Cir.1999)(declining to review rate making issue where issue not fully developed and appellant would have opportunity to challenge at later time).

### The Commission's Abdication of Its Constitutional Responsibilities

¶ 33 Section 2.8 of the agreement, as amended by Decision No. 61973, provides that rates shall remain unchanged at least until July 1, 2004, except "in the event of (a) conditions or circumstances which constitute an emergency, such as an inability to finance on reasonable terms, or (b) material changes in APS' cost of service for Commission regulated services resulting from federal, tribal, state or local laws, regulatory requirements, judicial decision, actions or orders." Section 6.1 makes the Commission a party to the agreement, and section 6.2 precludes the Commission from taking or proposing any action inconsistent with the agreement and requires the Commission to actively defend it.

¶ 34 The Council argues that, under these provisions, the Commission has contracted away its constitutional authority to make rates. According to the Council, the Com-

mission does not have the authority either to enter into a contract that deprives it of its rate making powers or to bind future Commissions from discharging their duties.

¶ 35 The state can authorize a municipality to establish by contract rates to be charged to a public service corporation for a definite term and to suspend the governmental power of fixing and regulating rates during the life of that contract. *See Home Tel. & Tel. Co. v. City of Los Angeles,* 211 U.S. 265, 273, 29 S.Ct. 50, 53 L.Ed. 176 (1908). Because such a contract can extinguish a governmental power, the authority to make the contract must be clear and unmistakable. *Id.*

¶ 36 The Council cites several cases in which a court found that a legislative grant of authority to a municipality or other entity to engage in some form of regulation was insufficient to permit that entity to limit the exercise of that authority where not expressly stated by the legislature. *See Home Tel. & Tel.,* 211 U.S. at 274, 29 S.Ct. 50; *Communications Workers of America v. Arizona Bd. of Regents,* 17 Ariz.App. 398, 400, 498 P.2d 472, 474 (1972); *School Dist. No. 69 of Maricopa County v. Altherr,* 10 Ariz.App. 333, 338, 458 P.2d 537, 542 (1969) *overruled in part on other grounds by Board of Trustees of Marana Elem. School, Dist. No. 6 v. Wildermuth,* 16 Ariz.App. 171, 492 P.2d 420 (1972). The Council therefore reasons that, just as a legislature would have to expressly authorize an entity to contractually limit its delegated authority, so too must the Arizona Constitution expressly authorize the Commission to "contract away" its constitutional authority. According to the Council, the constitution does not expressly authorize the Commission to contract for rates for a particular period, and therefore the Commission lacks the authority to do so. We, however, disagree.

¶ 37 As previously noted, the Arizona Constitution grants the Commission "full power" with respect to rate making. Ariz. Const. art. 15, § 3. This authority includes "all powers which may be necessary or essential in connection with the performance of its duties." *See Garvey v. Trew,* 64

Ariz. 342, 346–47, 170 P.2d 845, 848 (1946) (noting that Commission has constitutional power to enter into contracts with the Federal Power Commission for co-operation under the Federal Power Act). The Commission's authority over rate making is plenary and cannot be interfered with by the legislature, the courts, or the executive branch.[10] *See Ethington*, 66 Ariz. at 392, 189 P.2d at 216; *Morris v. Arizona Corp. Comm'n*, 24 Ariz. App. 454, 457, 539 P.2d 928, 931 (1975). Given that it has complete and exclusive power to set rates, the Commission clearly and unmistakably has the authority to enter into rate contracts, including those specifying rates for a definite period of time, where it believes it necessary to fulfill its rate making function. No further grant of authority is necessary.[11]

¶ 38 The Council also argues that the Commission cannot enter into a rate contract that binds future Commissions. The general rule, however, is that a contract that extends beyond the terms of the members of a public board is valid if made in good faith and if it does not involve the performance of personal or professional services for the board. *See City of Phoenix v. Long*, 158 Ariz. 59, 62, 761 P.2d 133, 136 (App.1988). The Council has not alleged that the contract was not entered into in good faith, and the contract does not involve personal services for Commission members. The contract

therefore can bind future commissions. *See, e.g., U.S. West Communications, Inc. v. Arizona Corp. Comm'n*, 185 Ariz. 277, 281–82, 915 P.2d 1232, 1236–37 (App.1996). Based on the foregoing, we conclude that the Council has failed to demonstrate that the Commission unlawfully contracted away its rate making power.

### Attorneys' Fees

¶ 39 The Council has requested attorneys' fees and costs pursuant to A.R.S. section 12–348(A)(2), which awards fees and other expenses to a party that prevails by an adjudication on the merits in a review of a state agency decision. Because the Council has not prevailed on appeal, we decline to award fees and expenses.

### CONCLUSION

¶ 40 For the foregoing reasons, we affirm the Commission's Decision No. 61973.

CONCURRING: PHILIP E. TOCI, Presiding Judge, JAMES B. SULT, Judge.

---

10. The one exception to this exclusive authority over rate making allows the legislature to transfer the rate making authority of the Commission to incorporated cities and towns. Ariz. Const. art. 15, § 3. *See Tucson Gas*, 15 Ariz. at 296–98, 138 P. at 782.

11. We also disagree with the Council's contention that the Commission has contracted away its rate making authority. As previously discussed, the Commission has limited its authority to review rates until July 2004, the agreement provides for possible rate changes in some circumstances, such as an emergency—a term whose definition is left largely to the Commission.