IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,
*Plaintiff/Appellee*,

*v.*

WATTS WATER TECHNOLOGIES, INC., *Defendant/Appellant.*

STATE FARM FIRE AND CASUALTY INSURANCE COMPANY,
*Plaintiff/Appellee*,

*v.*

WATTS REGULATOR COMPANY, *Defendant/Appellant.*

No. 1 CA CV 16-0500, 1 CA-CV 16-0559 (Consolidated)
FILED 2-6-2018

Appeal from the Superior Court in Mohave County
No. S8015CV201600190
The Honorable Charles W. Gurtler, Judge

Appeal from the Superior Court in Maricopa County
No. CV2016-005213
The Honorable James T. Blomo, Judge (Retired)

**REVERSED AND REMANDED**

COUNSEL

Bauman Loewe Witt & Maxwell, PLLC, Scottsdale
By Frank B. Jancarole
*Counsel for Appellee Allstate*

Manning & Kass Ellrod, Ramirez, Trester, LLP, Phoenix
By Scott A. Alles, Keith R. Ricker
*Co-Counsel for Appellee State Farm*

Grotefeld, Hoffmann, Schleiter, Gordon, Ochoa & Evinger, LLP, Geneva,
Illinois
By Jonathan Tofilon
*Co-Counsel for Appellee State Farm*

Grotefeld, Hoffmann, Schleiter, Gordon, Ochoa & Evinger, LLP,
Minneapolis, Minnesota
By Daniel W. Berglund
*Co-Counsel for Appellee State Farm*

Lewis Brisbois Bisgaard & Smith LLP, Phoenix
By James K. Kloss, Adam S. Polson
*Counsel for Appellant Watts*

---

**OPINION**

Judge John C. Gemmill[1] delivered the opinion of the Court, in which Presiding Judge Kenton D. Jones and Judge Jon W. Thompson joined.

---

**G E M M I L L**, Judge:

**¶1**        Watts Water Technologies, Inc. ("Watts") appeals the denial of its motions to dismiss and compel arbitration. The parties disagree about whether these product liability subrogation claims are subject to mandatory contractual arbitration. For the following reasons, we reverse and remand for proceedings consistent with this opinion.

**BACKGROUND**

**¶2**        In April 2014, a Watts-made water supply line allegedly failed at the residence of Terry and Lisa McNemar, causing property damage. The McNemars' insurer, Allstate Property and Casualty Insurance Company

---

[1]        The Honorable John C. Gemmill, Retired Judge of the Arizona Court of Appeals, Division One, has been authorized to sit in this matter pursuant to Article 6, Section 3, of the Arizona Constitution.

("Allstate"), paid $53,149.65 for the McNemars' loss and nearly two years later, in March 2016, filed a subrogation action against Watts.

¶3        In June 2014, Russell and Pam Vaughn suffered property damage following the alleged malfunction of a reverse osmosis water filter manufactured by Watts.  The Vaughns were insured by State Farm Fire and Casualty Insurance Company, Inc. ("State Farm").   State Farm paid $15,675.00 for the Vaughns' loss and filed a subrogation action against Watts in April 2016.

¶4        At the time of the incidents causing property damage, Allstate, State Farm (collectively, "the Insurers"), and Watts were parties to a Property Subrogation Arbitration Agreement ("the Agreement") promulgated by Arbitration Forums, Inc. ("AF"), which required that signatory companies forego litigation and arbitrate property subrogation claims.  Article First of the Agreement, signed by Allstate in 1996 and State Farm in 2003, provided in pertinent part:

> Signatory companies are bound to forego litigation and in place thereof submit to arbitration any questions or disputes which may arise from . . . any fire subrogation or property damage claim not in excess of $100,000.

The Agreement, signed by Watts in 2005, also provided, in Article Fifth, that "AF, representing the signatory companies, is authorized to . . . (a) make appropriate Rules and Regulations for the presentation and determination of controversies under this Agreement."[2]

¶5        In November 2014, AF advised its signatory members through an e-bulletin that, effective January 1, 2015, it was adding a "new exclusion" to the Agreement that would remove product liability claims arising from allegedly defective products from the claims subject to mandatory arbitration between signatory companies.  The November e-bulletin further advised:

---

[2]        Article Fifth further authorized AF to: "(b) determine the location, and the means by which, arbitration cases are heard; (c) determine qualification criteria and provide for the selection and appointment of arbitrators; (d) establish fees; (e) invite other insurance carriers, **noninsurers**, or **self-insureds** to participate in this arbitration program, and compel the withdrawal of any signatory for failure to conform to the Agreement or the Rules issued thereunder."  (Emphasis in original.)

> While the use of the Property Program to resolve disputes involving product liability claims arising from an alleged defective product will no longer be compulsory as of January 1, 2015, cases filed prior to January 1, 2015 will remain in arbitration's jurisdiction and will be processed to hearing.

¶6        AF did not include the foregoing e-bulletin language regarding claims accrued or "cases filed prior to January 1, 2015" within the revised Agreement ("Amended Agreement") promulgated by AF in January 2015.  Instead, only the following exclusion (i) was added to Article Second:

> **Article Second**
> *Exclusions*
>
> No company shall be required, without its **written consent**, to arbitrate any claim or suit if:
>
> . . .
>
> (i) it is a product liability claim arising from an alleged defective product.

(Emphasis in original).  The Amended Agreement does not include any language specifying whether the new exclusion applied to claims accruing before 2015 but not filed until after January 1, 2015.  Neither Watts nor the Insurers signed the Amended Agreement with the new exclusion removing product liability claims from compulsory arbitration.

¶7        In 2016, the Insurers filed product liability actions against Watts in superior court, based on the losses that occurred in 2014.  Watts moved for dismissal of the lawsuits or alternatively for a stay and order compelling arbitration.  Watts argued the claims accrued before January 2015 and were therefore subject to mandatory arbitration under the Agreement in effect in 2014.  After briefing and oral argument, the superior court in State Farm's case denied Watts's motion, finding the Agreement "was modified and the matter before the Court is not subject to mandatory arbitration."  The superior court in Allstate's case concluded that "as both Plaintiff and Defendant are signatories to the AF Agreement, they are bound by the provisions of the same, including the right of AF to delineate when its services will be provided," and, therefore, denied the motion.  Watts timely appeals the superior court's orders denying the motions to dismiss and compel arbitration.  We have consolidated these appeals.  Appellate jurisdiction is based upon Arizona Revised Statutes ("A.R.S.")

sections 12-120.21(A)(1) (2018) and -2101.01(A)(1) (2018). *See also Brumett v. MGA Home Healthcare, L.L.C.*, 240 Ariz. 420, 430-31, ¶¶ 20-21 (App. 2016).

## ANALYSIS

**¶8**       Watts argues the superior court erred in denying its motions to dismiss and compel arbitration because AF's change to the Agreement does not govern claims *arising* before the change. The Insurers maintain that AF was authorized by the Agreement to exclude product liability claims because of its power to make "appropriate Rules and Regulations for the presentation and determination of controversies under th[e] Agreement," and therefore the superior court correctly determined product liability claims *filed* after January 1, 2015 were "excluded" from compulsory arbitration. The parties ask us to determine which is applicable — the Agreement, based on date of loss, or the Amended Agreement, based on date of filing.[3]

**¶9**       The validity and enforceability of an arbitration agreement are mixed questions of fact and law that we review de novo. *Estate of DeCamacho ex rel. Guthrie v. La Solana Care & Rehab, Inc.*, 234 Ariz. 18, 20-21, ¶ 9 (App. 2014) (citing *Schoneberger v. Oelze*, 208 Ariz. 591, 594, ¶ 12 (App. 2004)). We also review de novo a trial court's decision whether to compel arbitration. *Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Props., Inc. v. Robson*, 231 Ariz. 287, 291, ¶ 9 (App. 2012) (citing *Nat'l Bank of Ariz. v. Schwartz*, 230 Ariz. 310, 311, ¶ 4 (App. 2012)).

**¶10**       A written arbitration agreement "is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the

---

[3]       The insured homeowners are not signatories to the AF Agreement. The parties have focused on the dates of the property losses and the dates the subrogation actions were filed in superior court. The parties have not addressed the dates the Insurers paid the claims. Generally, an insurer's right to subrogation does not arise until it has made payment for the property damage and thereby becomes subrogated to the claim. *See Safeway Ins. v. Collins*, 192 Ariz. 262, 266, ¶ 19 (App. 1998) (citing *Hamman-McFarland Lumber Co. v. Ariz. Equip. Rental Co.*, 16 Ariz. App. 188, 190 (1972), and *St. Paul Fire & Marine Ins. v. Glassing*, 887 P.2d 218, 220 (Mont. 1994)). The record on appeal does not establish when the Insurers made payments and became subrogated to their insureds' claims. The parties have not argued or briefed whether the date of payment by the Insurers was significant, and we do not address that issue.

revocation of any contract." A.R.S. § 12-1501 (2018); *accord* A.R.S. § 12-3006(A) (2018); *see also U.S. Insulation, Inc. v. Hilro Constr. Co.*, 146 Ariz. 250, 256 (App. 1985). When a party denies the existence of an agreement to arbitrate, the trial court "shall proceed summarily to the determination of the issue so raised." A.R.S. § 12-1502(A) (2018); *see also* A.R.S. § 12-3006(B) ("The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate."). "Although it is commonly said that the law favors arbitration, it is more accurate to say that the law favors arbitration of disputes that the parties have agreed to arbitrate." *S. Cal. Edison Co. v. Peabody W. Coal Co.*, 194 Ariz. 47, 51, ¶ 11 (1999) (citing *Clarke v. ASARCO Inc.*, 123 Ariz. 587, 589 (1979), and *Pima Cty. v. Maya Constr. Co.*, 158 Ariz. 151, 154 (1988)); *see also Smith v. Pinnamaneni*, 227 Ariz. 170, 176, ¶ 22 (App. 2011) ("[A] party is bound to arbitrate only those disputes which it has contractually agreed to arbitrate.").

¶11 The parties do not contest the validity of the Agreement or the Amended Agreement. The parties acknowledge that each signed the Agreement to forego litigation and submit to arbitration all claims described therein.[4] The parties also agree that the Amended Agreement was effective January 2015 and applies to all claims accruing thereafter. Watts, however, contends the Amended Agreement did not negate its right to arbitration of claims that *arose* before January 2015, but were filed after January 1, 2015. The Insurers argue in response that the Amended Agreement unambiguously applies to all claims *filed* after January 1, 2015, regardless of when the claim arose.

¶12 To resolve this conflict, we look to the plain language of the Agreement and Amended Agreement. *See US W. Commc'ns, Inc. v. Ariz. Corp. Comm'n*, 185 Ariz. 277, 280 (App. 1996) (explaining the purpose of contract interpretation "is to determine and enforce the parties' intent" (citing *Taylor v. State Farm Mut. Auto. Ins.*, 175 Ariz. 148, 152 (1993))). "[I]t is axiomatic that any agreement must be construed as a whole, and each part must be read in light of all the other parts." *C & T Land & Dev. Co. v. Bushnell*, 106 Ariz. 21, 22 (1970) (citing *Goodman v. Newzona Inv. Co.*, 101 Ariz. 470, 473 (1966)). We apply a common-sense approach and consider the language used and the organizational structure of the contract. *See Sw. Sav. & Loan Ass'n v. SunAmp Sys., Inc.*, 172 Ariz. 553, 560 (App. 1992) (citing *Burkons v. Ticor Title Ins*, 168 Ariz. 345, 350-51 (1991)); *see also Fishman v. LaSalle Nat'l Bank*, 247 F.3d 300, 302-03 (1st Cir. 2001) ("Common sense is as

---

[4] Although Allstate contends it "did not have a direct contractual relationship" with Watts, it agrees that each party was "bound by the rules and services administered and offered by AF."

much a part of contract interpretation as is the dictionary or the arsenal of canons.").

¶13        Based on the language of the Agreement in effect in 2014 when the property damage occurred, arbitration of product liability claims less than $100,000 was compulsory — the Insurers and Watts had agreed upon it.  The Insurers contend, however, that the Agreement was amended and superseded in 2015 by the Amended Agreement and that AF had the power to promulgate new exclusions because Article Fifth of the Agreement authorized AF to "make appropriate Rules and Regulations for the presentation and determination of controversies under this Agreement."    To evaluate this provision, we must examine the organizational structure and language of the Agreement.

¶14        Article First of the Agreement describes with specificity the disputes the signatory companies agreed to arbitrate, limited by the exclusions in Article Second.  Articles First and Second therefore delineate the controversies the parties agreed to arbitrate.

¶15        Article Fifth separately empowers AF to make rules and regulations for the arbitration of "controversies under this Agreement" — that is, to promulgate procedures for the presentation of evidence and conduct of the arbitrations.  AF's unilateral addition of a new exclusion of product liability claims from mandatory arbitration was not a mere procedural rule change.  Rather, it was a significant, substantive change. *Cf. Thurston v. Judges' Retirement Plan*, 179 Ariz. 49, 51 (1994) ("[I]t is generally agreed that a substantive law creates, defines and regulates rights while a procedural one prescribes the method of enforcing such rights or obtaining redress.").  Nowhere does Article Fifth authorize AF to change, expand, or contract the disputes the signatories specifically agreed to arbitrate in Articles First and Second.  The other portions of Article Fifth — addressing details such as fees, locations, means, and selection of arbitrators, *see supra* note 2 — further confirm that Article Fifth does not authorize AF to amend Articles First or Second and thereby unilaterally expand or contract the controversies the parties have agreed to arbitrate.

¶16        Based on a plain reading of the Agreement, therefore, AF was not empowered to unilaterally amend the predetermined "controversies under this Agreement."  The "controversies" subject to the Agreement were those described in Article First and not excluded by Article Second.  We therefore conclude that these signatory parties — by agreeing AF would

provide rules and regulations for arbitrations — did not empower AF to change which controversies were subject to compulsory arbitration.[5]

¶17 Moreover, application of the Agreement to these claims is confirmed by A.R.S. § 12-1501:

> A written agreement to submit any *existing controversy* to arbitration or a provision in a written contract to submit to arbitration *any controversy thereafter arising* between the parties is valid, *enforceable and irrevocable*, save upon such grounds as exist at law or in equity for the revocation of any contract.

 (Emphasis added); *accord* A.R.S. § 12-3006(A). The statute indicates that an "existing controversy" and "any controversy thereafter arising" become "enforceable and irrevocable" upon the arising of the controversy, unless the parties agree otherwise. There is no requirement for the formal filing of a demand for arbitration or an action in court. The controversies at issue here arose before 2015 and the Agreement became "enforceable and irrevocable" between the signatories prior to the Amended Agreement. Accordingly, the accrual of these property damage claims in 2014 triggered the application of the Agreement providing mandatory arbitration of these product liability claims.

¶18 Nevertheless, the Insurers rely upon the language of the November 2014 e-bulletin to argue the Amended Agreement specifies the operative date for the exclusion of product liability claims is the date the claim was filed, not the date the claim arose. But the e-bulletin language is not part of any agreement signed by the parties, nor is it part of the

---

[5]     State Farm at oral argument before this court contended that an unpublished, unappealed order in *Watts Water Technologies v. Arbitration Forums, Inc.*, 1:14-cv-14411-RGW (D. Mass. Feb. 24, 2015), constituted res judicata or collateral estoppel preventing Watts from arguing in this appeal that AF did not have the power to unilaterally impose the product liability exclusion. We disagree. In its February 2015 order, the Massachusetts federal district court granted a motion to dismiss Watts's complaint for failure to state a claim because, according to the court, AF was not a party to the Agreement. In dicta, the court expressed the view that the parties had "implicitly recognize[d] the authority of AF to define the scope of the arbitration services that it will offer." We are not bound by that court's ruling, nor its differing interpretation of the Agreement.

Amended Agreement. The Amended Agreement does not contain any new language beyond exclusion (i). The e-bulletin presumably represents the desire of AF, but this record reveals no contractual documents signed by Watts or the Insurers stating that the Amended Agreement would apply to all actions *filed* after January 1, 2015, even if the claims *accrued* prior to that date.

¶19        The Insurers also rely on an opinion of the Illinois Court of Appeals that addressed similar issues, *State Farm Fire & Casualty Co. v. Watts Regulator Co.* (*Montero*), 63 N.E.3d 304 (Ill. App. Ct. 2016). The court in *Montero*, however, conflated the e-bulletin language with the language of the Amended Agreement. The *Montero* court twice quoted the Amended Agreement as saying, "cases *filed* prior to January 1, 2015, will remain in arbitration's jurisdiction and will be processed to hearing." *Id.* at 307-08, ¶¶ 4, 8. However, that language is found only in the e-bulletin; the Amended Agreement contains no such language. The *Montero* opinion is therefore unpersuasive.

¶20        The Insurers further rely on an Indiana Court of Appeals case, *Watts Water Technologies, Inc. v. State Farm Fire & Casualty Co.* (*Lucka*), 66 N.E.3d 983 (Ind. Ct. App. 2016), which relied in part on the *Montero* case and the e-bulletin language. The *Lucka* court also decided that AF's authority to make rules and regulations included the authority to add the product liability exclusion at issue here. *Id.* at 989. We disagree with *Lucka's* analysis.

¶21        Finally, State Farm relies upon Article Sixth, Withdrawals, to support its interpretation of the Agreement. The provision states:

> Any signatory company may withdraw from this Agreement by notice in writing to AF. Such withdrawal will become effective sixty (60) days after receipt of such notice except as to cases then pending before arbitration panels. The effective date of withdrawal as to such pending cases shall be upon final compliance with the finding of the arbitration panel on those cases.

This provision specifically addresses claims pending at the time of withdrawal. In contrast, the Amended Agreement does not address whether the new exclusion of product liability claims applies to pending claims or claims already accrued but not yet filed. The withdrawal provision does not provide the answer to the issue before us.

**CONCLUSION**

**¶22**      The Agreement does not give AF the power to unilaterally impose the product liability exclusion, and Watts and the Insurers never agreed between themselves to apply the Amended Agreement to claims arising before 2015. Accordingly, the Agreement in effect in 2014 applies to these property damage claims and the Amended Agreement does not. We therefore vacate the superior court's orders denying Watts's motions to compel arbitration and remand for further proceedings consistent with this opinion. We award taxable costs to Watts upon compliance with Arizona Rule of Civil Appellate Procedure 21(b).