EPPICH, Judge:
¶ 1 This is an appeal from the Arizona Corporation Commission's (the Commission) Decision No. 75975 (Feb. 24, 2017) (the Decision), which established electricity rates for the customers of Tucson Electric Power (TEP). Appellant Freeport Minerals Corporation challenges the Decision's allocation of revenue between rate classes, arguing that it violates constitutional and statutory mandates for just, reasonable, and nondiscriminatory rates, and was not supported by substantial evidence. For the following reasons, we affirm.
Factual and Procedural Background
¶ 2 TEP, a wholly owned subsidiary of UNS Energy Corporation, is an Arizona public service corporation[1] authorized to provide electricity services. On September 4, 2015, TEP filed with the Commission a notice of intent to file a rate case application, seeking, among other things, a new rate schedule to allow it to "recover its full cost of service, including a reasonable opportunity to earn appropriate return on invested capital." Numerous entities, including government bodies, advocacy groups, and corporations, including Freeport, sought and were granted permission to intervene.
¶ 3 TEP initially requested an increase in rates that would result in a non-fuel revenue increase of approximately $109.5 million over adjusted test year[2] revenues. However, following settlement discussions, many of the parties to the proceeding, including TEP and Freeport, entered into an agreement dated August 15, 2016 ("Settlement Agreement") which provided for a non-fuel revenue increase of $81.5 million, resulting in a total rate of return for TEP of 7.19 percent. The Settlement Agreement, which ultimately was approved by the Commission, did not address all issues, leaving open the revenue allocation among the rate classes.
¶ 4 On January 24, 2017, after taking several days of testimony and receiving a number of briefs on the issue of revenue allocation, *944 the Commission issued a proposed order, to which Freeport and a number of other parties filed exceptions. On February 8, 2017, the Commission held an open meeting to discuss the proposed order and the exceptions filed to it, and on February 24, 2017, the Commission issued the Decision, which adopted a nearly identical revenue allocation scheme as the one set forth in the proposed order. Freeport timely sought review, challenging only the revenue allocation portion of the Decision. We have jurisdiction pursuant to A.R.S. § 40-254.01.
Discussion
¶ 5 "The Arizona Corporation Commission, unlike such bodies in most states, is not a creature of the legislature, but is a constitutional body which owes its existence to provisions in the organic law of this state." Residential Util. Consumer Office v. Ariz. Corp. Comm'n , 240 Ariz. 108, ¶ 11, 377 P.3d 305 (2016), quoting Ethington v. Wright , 66 Ariz. 382, 389, 189 P.2d 209 (1948) ; see Ariz. Const. art. XV, §§ 1 - 19. The Arizona Constitution grants the Commission "full power to ... prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the state for service rendered therein." Ariz. Const. art. XV, § 3. As such:
[I]n the matter of prescribing classifications, rates, and charges of public service corporations and in making rules, regulations, and orders concerning such classifications, rates, and charges by which public service corporations are to be governed, the Corporation Commission ... is supreme and such exclusive field may not be invaded by the courts, the legislature, or the executive.
Residential Util. Consumer Office , 240 Ariz. 108, ¶ 12, 377 P.3d 305, quoting Ethington , 66 Ariz. at 392, 189 P.2d 209 (first alteration in original).
¶ 6 Notwithstanding what has been described as the Commission's "plenary" authority to prescribe rates, the Arizona Constitution's requirement of "just and reasonable" rates imposes an outer limit for the Commission's discretion. Residential Util. Consumer Office v. Ariz. Corp. Comm'n , 199 Ariz. 588, ¶ 11, 20 P.3d 1169 (App. 2001). Because ratemaking is a function specifically entrusted to the Commission by the Arizona Constitution, a stringent standard of review applies: "We generally presume the Commission's actions are constitutional, and we uphold them unless they are arbitrary or an abuse of discretion." Residential Util. Consumer Office , 240 Ariz. 108, ¶ 10, 377 P.3d 305. Freeport must therefore "demonstrate, clearly and convincingly, that the Commission's decision is arbitrary, unlawful or unsupported by substantial evidence." Litchfield Park Serv. Co. v. Ariz. Corp. Comm'n , 178 Ariz. 431, 434, 874 P.2d 988, 991 (App. 1994) ; accord A.R.S. § 40-254.01(A), (E).
Utilities Regulation
¶ 7 "The general theory of utility regulation is that the total revenue, including income from rates and charges, should be sufficient to meet a utility's operating costs and to give the utility and its stockholders a reasonable rate of return on the utility's investment." Scates v. Ariz. Corp. Comm'n , 118 Ariz. 531, 533-34, 578 P.2d 612, 614-15 (App. 1978). The Commission determines rates using a proceeding called a "rate case." See Ariz. Admin. Code R14-2-103. "Rule 103 or 'full' rate case proceedings are complex. They typically attract many intervenors, require voluminous and detailed filings, and involve multiple, lengthy hearings." Residential Util. Consumer Office , 240 Ariz. 108, ¶ 6, 377 P.3d 305. In a rate case, "[t]he Commission sets rates by finding the 'fair value' of a utility's in-state property, Ariz. Const. art. 15, § 14, and then using that value as the 'rate base' in the following rate-of-return formula: (Rate Base x Rate of Return) + Expenses = Revenue Requirement." Residential Util. Consumer Office , 240 Ariz. 108, ¶ 6, 377 P.3d 305. In determining a utility's rate base, operating income, and rate of return, the Commission uses data from the test year. Ariz. Admin. Code R14-2-103. No party has challenged the Commission's determination of the revenue requirement.
¶ 8 Having determined TEP's revenue requirement, the Commission next allocated said revenue to the various customer classes.
*945 As a starting point for allocating the revenue requirement to each class, the utility's costs were first allocated to each class through a "Class Cost of Service Study" (CCOSS).[3] See id. As the Commission's Utilities Division Staff's (Staff) rate design witness testified, the CCOSS is "intended to assist the Commission to allocate revenue requirements among customer classes."
¶ 9 Preparing a CCOSS is far from a straightforward endeavor. As Staff explained, preparing a CCOSS "involves judgment and decisions on the part of the practitioner in assigning costs to the various customer classes." TEP's CCOSS witness made the same point:
Fundamentally, performing cost of service studies is comprised of applying experience and science.... The art of applying experience involves the subjective application of certain methods, in conjunction with consideration of policy objectives, regulatory case law, emerging issues, and other factors, within the framework of the regulatory process.... The art of the cost study is having an understanding of how the unique characteristics of the utility should be combined with the various scientific methodologies.
Freeport has not challenged the CCOSS in this case.
¶ 10 Once the CCOSS is complete, it may be used to measure the degree to which each class rate schedule produces more or less revenue than would be produced if revenue were allocated solely using the CCOSS, that is, the degree of "subsidy" paid by (or received by) each customer class. There are various ways this can be measured, such as computing the relative rate of return (RoR) produced by each class. However, as Staff explained, "regulators have historically used" the CCOSS "as a guideline to allocate revenue among classes" but "[r]egulators typically also consider economic, social, historical and other factors that may affect customers when determining revenue allocation" and that such factors "often result in rates that deviate from strict cost of service."
The 2015 Rate Case
¶ 11 Here, the CCOSS showed that while TEP's total RoR for the test year was 6.57 percent, the RoR on the rate bases for individual classes differed significantly, with the Residential Class at 0.94 percent, the General Service Class at 21.33 percent, the Large General Service Class at 3.59 percent, the Lighting Class at 2.96 percent, and the Large Power Service Class at 10.94 percent. This difference in RoR produced the "significant [pre-Decision] inter-class subsidies," acknowledged by the Commission, with classes above the total rate of return of 6.57 percent subsidizing classes with a rate of return below 6.57 percent.
¶ 12 Staff, TEP, Freeport, and the Commission all agreed that rates should generally be based on costs derived from the CCOSS. Further, all agreed with the goal of reducing the pre-existing interclass subsidies in the instant rate case. To that end, Staff, TEP, and Freeport each submitted allocation proposals for the Commission's consideration. While all three proposals reduced the size of the interclass subsidies, albeit by varying amounts, none proposed a revenue allocation that would erase all subsidy and bring complete class parity under the CCOSS.[4]
¶ 13 Staff stated, "The individual rate classes should be gradually moved toward [the elimination of interclass subsidies] over one or more rate cases depending on the frequency of rate cases and the distance of the class[ ] [from parity]." However, Staff noted that since the last rate case TEP changed its production plant allocation methodology. Further, in this rate case, two new rate classes were implemented: a Medium General Service Class, split off from the Small and Large General Services Classes, and a 138kV Class for large industrial users, split off from the Large Power Service *946 Class.[5] Given the changes in rate base and changes in TEP's cost allocation methodology, Staff recommended that the Commission use the CCOSS as a general guideline, tempered by the concept of gradualism, as explained below.
¶ 14 Additionally, since the previous rate case TEP had completed the purchase of a new combined cycle generating unit, in order to stabilize energy costs for all customers.[6] Staff submitted that it therefore would be inappropriate to reduce rates for any individual customer class. It recommended that the $81.5 million in approved revenue increases be allocated by increasing the Residential, Large General Service, and Lighting Classes by fifty percent of the amount needed to eliminate the pre-existing subsidies, and increasing the other classes by varying amounts to account for the remaining $23.3 million. Under this plan, the RoR for all classes below the approved total of 7.19 percent would increase, and the RoR for all classes above the 7.19 percent would decrease, "moving the classes towards parity."
¶ 15 TEP stated that it was "willing to use Staff's suggestion as a guide to adjust the allocation of revenue between the rate classes in the interest of compromise, gradualism and movement in the right direction to eliminate some of the interclass subsidies." TEP accepted Staff's "concerns that new rates should be designed to reflect appropriate cost allocation while still setting rates that exhibit the principle of gradualism," and agreed that "the CCOSS should be used as a guideline, not as a rigid structure, for revenue allocation decisions." However, recognizing that "[l]arger customer classes [were] seek [ing] a greater movement towards parity," TEP proposed a revenue allocation scheme "somewhere between the proposals of Staff and the parties representing large customers." Its scheme allocated less to the large power using classes and Residential Class, and more to the General Service Classes[7] and the Lighting Class. Both TEP and Staff asserted that their proposed schemes were designed to allow elimination of the interclass subsidies in the near future: TEP stated its proposal "provide[d] the best opportunity to reach parity in the next rate case," and Staff stated its proposal "allow[ed] for the completion [of moving all classes to parity] in following cases."
¶ 16 The Commission ultimately adopted a hybrid of Staff and TEP's revenue allocation schemes, allocating the larger amount recommended by Staff, approximately $54.5 million of the $81.5 million in revenue increases, to the Residential Class, and employing TEP's proportionate allocation between the other classes for the remaining $27 million. It explained that allocating the "$81.5 million increase evenly across classes would perpetuate existing inequities," but moving all the rate classes to parity would cause an approximate increase of 39.5 percent in margin revenues to the Residential Class, equal to a roughly twenty-five percent increase in rates, resulting in "unreasonable rate shock." Given that "[a]ny reduction in allocation to one class, of necessity increases the allocation to another in order to produce the same overall revenue increase," and "considering the entirety of the circumstances," the Commission found that its allocation produced just and reasonable rates, which "move[d] toward[s] more equitable revenue recovery without overly burdening an individual customer class." The adoption of this revenue allocation scheme is the sole issue which Freeport challenges in this appeal.
Just, Reasonable, and Non-Discriminatory Rates
¶ 17 Freeport argues the adopted revenue allocation scheme violates both the Arizona *947 Constitution's mandate that the Commission set "just and reasonable" rates for public services, Ariz. Const. art. XV, § 3, and A.R.S. § 40-334's prohibitions against "subject[ing] any person to any prejudice or disadvantage" as to rates, and "establish[ing] or maintain[ing] unreasonable difference[s] as to rates ... between classes of service." The revenue allocation adopted by the Commission requires Freeport to pay approximately $4.2 million annually in subsidies.[8] It contends that "[b]y setting rates that exceed the cost of providing service to Freeport by such a significant margin, and by not adopting the cost standard of rate design, the Commission has set rates that are not just and reasonable." Freeport also argues that the adopted revenue allocation scheme is arbitrary and unsupported by substantial evidence.
¶ 18 Freeport has not argued that the Commission must set rates based only on cost of service to customers, and it has conceded that interclass subsidization may be "just and reasonable" in certain situations. It further concedes that the Commission's rate allocation reduced the overall amount of interclass subsidies being paid. Freeport argues, however, that the interclass subsidies were not reduced enough , and the reasons provided in support of the adopted allocation scheme are insufficient to support this perceived lack of "meaningful progress towards that goal." Therefore, the question before us is whether the record contains sufficient reasons upon which the Commission could, in its broad discretion, deviate from a strict cost standard of rate design and adopt a rate plan that considers more than the cost of service and the rate of return.
¶ 19 The Commission's adopted allocation scheme is primarily supported by gradualism and the need to avoid rate shock, and the proposition that, due to TEP's acquisition of the new combined cycle generating unit, it would be inappropriate to reduce rates for any individual customer class. Freeport challenges both of these justifications.
¶ 20 " 'Gradualism' is a principle of rate design that rates will be gradually increased to avoid 'rate shock' ... by 'gradually' reducing rate of return differentials between the classes." Lloyd v. Pa. Pub. Util. Comm'n , 904 A.2d 1010, 1018 n.14 (Pa. Commw. Ct. 2006). Gradualism is a well-recognized tenet of, and generally accepted as a legitimate concern in, utility ratemaking. See id. at 1019 n.16 (listing utility regulation cases recognizing the legitimacy of "gradualism" from Connecticut, Indiana, Mississippi, New Mexico, North Carolina, Pennsylvania, South Carolina, and South Dakota).
[C]onsumers value stability and predictability in the bills they receive from their utility company: stability, so that the utility's call upon their income will not yo-yo beyond their control from period to period; predictability, permitting them to fashion their future budgets with some assurance that their increment for utility services will not be widely off the mark. Stability and predictability are important considerations to be kept in mind whenever a restructuring ... is being implemented. Rate shock is not a sought for result.
Roger L. Conkling, Energy Pricing: Economics and Principles § 8.3, 231 (2011).
To mitigate ... rate shock, the remedy is "gradualism," i.e., phasing in rates or closing rate differentials over a longer period of time allowing consumers to gradually make the adjustments in the "elastic" part of their spending so as to pay for increased utility costs, not to mention lessening the pressure on the Commission and the utilities to dampen rate increases.
Lloyd , 904 A.2d at 1018 n.14. The Commission having determined that subsidy reduction is appropriate, we conclude that rate shock is a well-founded concern which permits the Commission to invoke gradualism to deviate from strict cost of service when establishing a revenue allocation scheme that is *948 just and reasonable.[9] This, however, does not mean that the instant rate allocation necessarily passes constitutional muster.
¶ 21 Freeport has put forth a number of alternate allocation schemes which it argues would be more just and reasonable.[10] Each of these schemes entails a rate decrease for the 138kV Class. During the hearings, however, Staff argued that TEP's "purchase of the Gila River combined cycle generating unit was intended to stabilize energy costs, which provides benefits to all customers." Staff continued, "Therefore, it would be inappropriate to reduce rates for any customer class because that would send a confusing message about the new plant expenditure." TEP also accepted this principle in its revised position, and the scheme ultimately adopted by the Commission was a hybrid of their two proposals.[11]
¶ 22 Freeport challenges the notion that no class of service should have a rate decrease as arbitrary and based on Staff's " 'perceptions' rather than 'facts.' " It points out that Staff explained, "in relation to that power plant, 'there could be a perception, maybe not a fact, but there could be a perception among certain customers that they paid for the whole thing and some of the benefits went to people who didn't pay at all.' " Freeport further argues, "Whether a newly purchased power plant facility benefits 'some' or 'all' customers does not undercut the conclusions reached in the class cost of service study, and certainly should not be a basis to disregard the allocations set forth therein," and that Staff "[p]lainly" discounted the CCOSS to address its own "perceptions."
¶ 23 In fact, when pressed on this principle, Staff explained that "[t]he increase in rate base in this case was not solely due to Gila River. It was due to investments all across the spectrum of the company ... investments made other than Gila River that benefit[ ] all classes." Thus, that TEP's new investments benefited all customer classes was not a perception, but a stated fact.
¶ 24 Moreover, the "perceptions" Staff spoke of were not its own, but the anticipated reactions of the customer classes that Freeport argues should have shouldered the entire $165 million cost of that acquisition to the exclusion of itself. We conclude that Staff's concerns were reasonable, based on fact, and that the Commission was within its discretion in accepting the proposition that, due to TEP's new acquisitions and investments, no individual class should see a rate decrease.[12]
*949 ¶ 25 The CCOSS in this case showed that, for the test year, the Residential Class was subsidized by the other classes by approximately $109 million. As the agreed-upon revenue increase was $81.5 million, it would have been mathematically impossible to eliminate the subsidization of the Residential Class without decreasing rates for other classes of service. Allocating the entire $81.5 million to the Residential Class would have resulted in roughly a twenty-five percent increase in residential customers' bills. Freeport argues that this increase "does not constitute 'rate shock' because the Commission has imposed much higher rate increases on other utility customers," and cites to several 2016 rate cases in which "the Commission approved a number of increases for rates that range between 51.1 percent to 274.6 percent." Freeport is correct that the Commission authorized those rate increases. However, an examination of each of those decisions shows that those rate increases were brought about by extreme circumstances, and in each of those cases anything less than the approved revenue increases would have potentially violated our constitution's mandate for just and reasonable rates.
¶ 26 In Decision No. 75925 (Jan. 13, 2017), Eden Water Company, an Arizona non-profit, member-owned cooperative which serves 135 customers, had a test year revenue shortfall of $13,609. The 51.1 percent increase in a median customer's bills was required in order to allow Eden to eliminate its operating losses and earn the reasonable return on its rate base.
¶ 27 Similarly, in Decision No. 75811 (Nov. 21, 2016), Dateland Water LLC, which serves fourteen customers, had not had a rate increase since 1999, and had a revenue shortfall of well over thirty percent. The Commission approved rate increases of 274.97 percent, but even with that increase Dateland still ended up with a negative operating income, and it was the principle of avoiding rate shock which kept the Commission from adopting the 360.92 percent increases which would have been required to earn Dateland a positive return.
¶ 28 The other two cases cited by Freeport are similar: In Decision No. 75696 (Aug. 5, 2016), the utility had a $32,071 revenue shortfall on $79,086 of operating expenses; in Decision No. 75686 (Aug. 5, 2016), a $6,012 shortfall on $56,213 in operating expenses. Each of these cases presents a situation in which, due to historical circumstances, a small utility had to raise rates significantly to address substantial revenue shortfalls, and they do not persuade us that, in the instant case, the Commission's concerns about rate shock were unfounded or arbitrary.
¶ 29 Finally, Freeport argues that "barring no other substantial reasons or evidence, gradualism and rate shock" should not, by themselves, provide a sufficient "basis for sustaining continued inequitable subsidies," between classes of service, relying on Lloyd , 904 A.2d 1010.
¶ 30 Lloyd dealt with circumstances similar to those before us. There, the CCOSS showed that, for the test year, commercial customers were subsidizing the Residential Class. Id. at 1016. The Pennsylvania Commission also adopted an allocation scheme which raised rates on every customer class, and justified this by appealing to gradualism and the need to avoid rate shock. Id. at 1018. Freeport correctly points out that the court in Lloyd found that, "principles of gradualism," while permitted, "cannot be allowed to trump all other valid ratemaking concerns and do not justify allowing one class of customers to subsidize the cost of service for another class of customers over an extended period of time," and struck down the revenue allocation scheme. Id. at 1020-21. However, despite the superficial similarities with the instant case, Lloyd is distinguishable on several key points.
¶ 31 In Lloyd , the Pennsylvania Commission employed gradualism not as a general rate-making principle, but as a bright line *950 rule holding that no individual customer's bill should increase more than ten percent, without providing any explanation for why ten percent "is the magic number that will prevent rate shock." Id. at 1020. Here, the Commission applied the general and long-accepted principle that rates should be adjusted over time broadly, not allowing a threshold number to prevent them from reducing the subsidization of the Residential Class.
¶ 32 More importantly, in Lloyd the Pennsylvania Commission's allocation scheme significantly increased the amount of interclass subsidization. First, while "[i]t proposed to increase its distribution charges by an average of 32.8%" it "proposed an increase to the distribution charges paid by the [subsidizing] class of 35.8%," resulting in an increase in the pre-existing difference between the subsidizing and subsidized classes' respective RoRs. Id . at 1016-17. Further, the Pennsylvania Commission sought to allocate $57.2 million in transmission fees without any reference to a CCOSS, but instead through a uniform per kWh charge to all customers, resulting in large customers bearing a disproportionate amount of the transmission, and thus increasing any previous discrimination in rates even further. Id. at 1017.
¶ 33 Here, the opposite is true. The Commission specifically noted that allocating the $81.5 million evenly across the classes would perpetuate existing inequities between the classes. While interclass subsidization is not eliminated by the Decision, it does provide for significant movement towards parity for the rate classes. Freeport's rates only increased by approximately 1.7 percent compared to the test year, whereas residential rates increased by approximately 12.6 percent. The $54.5 million in revenue increases allocated to the Residential Class customers represents fifty percent of the amount needed to bring that class to parity, effectively cutting the subsidy they receive in half. Gradualism can be a sufficient justification for eliminating such subsidies incrementally.
Conclusion
¶ 34 The Arizona Constitution limits our role to deciding whether utility rates adopted by the Commission are so far outside of its considerable discretion so as to be unjust or unreasonable. We are not empowered to substitute our judgment of what we may find to be an optimal rate structure for the Commission's. The alternative rate allocations proposed by Freeport may well be just and reasonable, but that does not mean the scheme adopted by the Commission is not. For the foregoing reasons, Freeport has failed to "demonstrate, clearly and convincingly, that the Commission's decision is arbitrary, unlawful or unsupported by substantial evidence." Litchfield Park Serv. Co. , 178 Ariz. at 434, 874 P.2d at 991. Accordingly, we affirm.

A public service corporation is any non-municipal corporation:
engaged in furnishing gas, oil, or electricity for light, fuel, or power; or in furnishing water for irrigation, fire protection, or other public purposes; or in furnishing, for profit, hot or cold air or steam for heating or cooling purposes; or engaged in collecting, transporting, treating, purifying and disposing of sewage through a system, for profit; or in transmitting messages or furnishing public telegraph or telephone service.
Ariz. Const. art. XV, § 2.

A "test year" is a one-year historical period ending on the most recent practical date available prior to the filing. Ariz. Admin. Code R14-2-103.

As a class A utility with annual operating revenue in excess of $10 million, TEP was required to prepare a CCOSS pursuant to Arizona Administrative Code R14-2-103.

Freeport's proposal eliminated the subsidies paid by itself and the Large Power Service Class, but retained a level of subsidy to be paid by the General Services and Large General Service Classes to the benefit of the Residential and Lighting Classes.

Freeport is the only member of the 138kV Class, which was created for its benefit.

Combined cycle generators can start and stop operations more easily than coal generators. By purchasing the plant, TEP became less reliant on coal and, as a result, gained flexibility. We infer that this allows TEP to increase energy output with a lesser effect on fuel costs during periods of high energy demand.

Staff allocated significantly less to the Small General Service Class than TEP, but a slightly larger amount to the Medium and Large General Service Classes. In total, TEP allocated roughly $5.35 million more to the three General Service Classes than did Staff.

Freeport arrived at this $4.2 million figure using figures from Staff's proposed revenue models presented during surrebuttal testimony. Those models showed that Freeport paid approximately $32 million during the test year. The Commission authorized a revenue increase of $561,000 to the 138kV Class in the Decision, allocating a total of roughly $32.5 million in revenue to Freeport. The CCOSS showed that a under a strict cost standard it would pay roughly $28.3 million, resulting in the $4.2 million figure.

Freeport argues that the record does not support the Commission's concerns regarding rate shock, contending at oral argument that the Commission should have conducted surveys to assess the ability of residential consumers to manage the increased rates necessary to achieve rate parity. Freeport noted that the Residential Class likely contains higher-income individuals readily capable of absorbing significant rate increases. While this is undoubtedly true, the Commission is not required to set individualized rates based upon a particular customer's ability to pay-it need only set reasonable rates for classes of consumers. Moreover, the twenty-five percent rate increase necessary to eliminate the Residential Class subsidy in this case is of such magnitude that the potential for rate shock is self-evident.

Freeport suggests eliminating the subsidies paid only by it, reducing the subsidies it pays by half, or reducing the rates for itself and other large power users and allocating larger increases to the Residential Class.

The Decision decreases the revenue allocated to the Small General Service Class by approximately $3.6 million compared to the test year. However, this rate case saw the creation of a new Medium General Service Class, which is comprised of four thousand former Small General Service Class members and eighty-five Large General Service Class members. Rates paid by the remaining members of the Small General Service Class were in fact increased over the test year. As such, we surmise that the apparent $3.6 million decrease to the Small General Service Class was the result of this class-split, and not an actual reduction in rates for the Class.

At oral argument, the Commission maintained its Decision was not predicated on Staff's recommendation against any rate decreases due to TEP's acquisition of the generating unit. While the Decision does not expressly state the Commission relied on this proposition in its "Analysis and Conclusion Regarding Revenue Allocation" subsection, its consideration of this factor is readily apparent from the record. The proposition is discussed in the preceding subsections regarding TEP and Staff's revenue allocation positions, and the Decision expressly notes that it has adopted "Staff's recommendation for the Residential Class of $54.5 million and employs TEP's proportionate allocations for the remaining $27 million." Cf. Thomas v. Thomas , 142 Ariz. 386, 390, 690 P.2d 105, 109 (App. 1984) (appellate courts may infer from a judgment findings necessary to sustain it if such findings do not conflict with express findings and are reasonably supported by evidence). In any event, we conclude the Commission's Decision is adequately supported by considerations of rate shock and gradualism, regardless of whether or not it also relied on Staff's reasoning regarding the acquisition of the generating unit.