874 P.2d 988

**LITCHFIELD PARK SERVICE COMPANY, Appellant,**

v.

**ARIZONA CORPORATION COMMISSION, Appellee.**

**No. 1 CA–CC 92–0004.**

Court of Appeals of Arizona, Division 1, Department C.

April 21, 1994.

---

Snell & Wilmer by Steven M. Wheeler, Thomas L. Mumaw, Phoenix, for appellant.

Arizona Corp. Com'n by Bradford A. Borman, Janice M. Alward, Phoenix, for appellee.

## OPINION

EHRLICH, Judge.

Litchfield Park Service Company ("LPSCO") appeals from an order of the Arizona Corporation Commission ("Commission") which allowed only a portion of its requested rate increase for utility services. For the reasons which follow, we affirm the order of the Commission.

### *FACTS AND PROCEDURAL HISTORY*

LPSCO, a subsidiary of SunCor Development Company, whose parent company is Pinnacle West, is an Arizona corporation authorized to provide water and sanitary sewer services. On May 13, 1991, LPSCO filed with the Commission an application seeking permanent increases in its water and sewer rates based on a 1990 calendar test year. Testimony with regard to the requested increase was heard on February 4 and 5, 1992. On June 5, 1992, the Commission's hearing officer issued a proposed order, to which LPSCO and the Commission staff filed ex-

ceptions. The matter was heard by the Commission and, on July 6, 1992, it issued decision number 57944. LPSCO timely sought review pursuant to Arizona Revised Statutes Annotated ("A.R.S.") section 40–254.01.

## DISCUSSION

■ The Commission is charged with establishing just and reasonable rates to be charged by public-service corporations. *E.g.*, Ariz. Const. art. XV, § 3, cited in *Tucson Electric Power Company v. Arizona Corporation Commission*, 132 Ariz. 240, 242, 645 P.2d 231, 233 (1982); *Southwest Gas Corporation v. Arizona Corporation Commission*, 169 Ariz. 279, 283, 818 P.2d 714, 718 (App. 1991). To successfully challenge a Commission rate decision, a party "must make a clear and satisfactory showing that the order is unlawful or unreasonable." A.R.S. § 40–254.01(E); *see also* A.R.S. § 40–254.01(A) (appellate court may disturb Commission's order if it determines "upon a clear and satisfactory showing that the order is unlawful or unreasonable"). Accordingly, LPSCO is required to demonstrate, clearly and convincingly, that the Commission's decision is arbitrary, unlawful or unsupported by substantial evidence. *Consolidated Water Utilities v. Arizona Corporation Commission*, 178 Ariz. 478, 481, 875 P.2d 137, 140 (App.1993), citing *Tucson Electric*, 132 Ariz. at 243, 645 P.2d at 234. The above-mentioned statutes do not provide for de novo appeals. *Id.*

Upon this standard of review, we consider the five issues raised by LPSCO. Two of the questions raised concern LPSCO's equity in its sewage plant and in its water division. One issue pertains to the exclusion of a well from the rate base. A fourth dispute involves an income-tax expense. The final is-

sue addresses the depreciation expense of the sewer division.

### A. Sewage Plant—Amount of Equity

■ LPSCO first asserts that, with regard to its sewage-treatment facility, the Commission unlawfully or unreasonably, through a "mathematical sleight of hand" or "double counting," reduced its amount of common equity from 68.6 to 51.8 percent. To appreciate this argument, first, we must consider the separate determinations which the Commission makes to establish a utility's minimum rate of return.

■ A utility is entitled to a fair rate of return on the fair value of its property, "no more and no less." *Arizona Corporation Commission v. Citizens Utilities Company*, 120 Ariz. 184, 190 n. 5, 584 P.2d 1175, 1181 n. 5 (App.1978), quoting *Arizona Corporation Commission v. Arizona Water*, 85 Ariz. 198, 335 P.2d 412 (1959); *see e.g.*, *Public Service Commission of Montana v. Great Northern Utilities Company*, 289 U.S. 130, 135, 53 S.Ct. 546, 548, 77 L.Ed. 1080 (1933); *Bluefield Waterworks & Improvement Company v. Public Service Commission of West Virginia*, 262 U.S. 679, 690, 692–93, 43 S.Ct. 675, 678, 679, 67 L.Ed. 1176 (1923). Consequently, the Commission is obliged to "ascertain the fair value of the property within the State of every public service corporation," Ariz. Const. art. XV, § 14, and use this figure as a utility's rate base. *Scates v. Arizona Corporation Commission*, 118 Ariz. 531, 534, 578 P.2d 612, 615 (App.1978). The Commission then exercises its discretion in determining a utility's rate of return. *Id.*; *see e.g.*, *Bluefield Waterworks*, 262 U.S. at 692, 43 S.Ct. at 678–79 (rate "must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts").

■ The Commission determines the original cost rate base [1] and reconstructed cost new rate base; [2] the average of these two

1. Arizona Administrative Code ("A.A.C.") R14–2–103(A)(3)(h) defines the original cost rate base as "the depreciated original cost, prudently invested, of the property (exclusive of contributions and/or advances in aid of construction) at the end of the test year, used or useful, plus a proper allowance for working capital and including all applicable pro forma adjustments." *See also* A.A.C. R14–2–103(A)(3)(e) (defining "depreciated

original cost"); A.A.C. R14–2–103(A)(3)(*l*) (defining "prudently invested"); A.A.C. R14–2–103(A)(3)(i) (defining "pro forma adjustments").

2. Reconstructed cost new rate base is defined as "[a]n amount consisting of the depreciated reconstruction cost new of the property (exclusive of contributions and/or advances in aid of construction) at the end of the test year, used and

equals the fair value rate base. In making these determinations, the Commission excludes property not yet placed in service and held for future use and, in fact, LPSCO does not oppose the Commission's exclusion from rate base of the 47 percent of the sewage-treatment plant not currently used. After arriving at the rate base, the Commission then ascertains the utility's weighted cost of capital, typically by the following formula: [3] First, the Commission determines the utility's capital structure, the amount of equity and debt. In LPSCO's case, this was established separately for the sewer and water divisions. The ascertained percentage of debt is then multiplied by the cost of debt, and this amount is added to the product of the cost of equity and the percentage of equity. Generally, the cost of debt is not disputed because it is ascertainable as a fact. *Sun City Water Company v. Arizona Corporation Commission*, 26 Ariz.App. 304, 309, 547 P.2d 1104, 1109, vacated on other grounds 113 Ariz. 464, 556 P.2d 1126 (1976). The cost of equity, however, is less precise. *See id.* This sum, the weighted cost of capital, is multiplied by the utility's original cost rate base; this product then is divided by the fair value rate base.

■ As can be inferred from the above equation, a utility's capital structure is related to the actual rate of return on its common equity. *Citizens Utilities Company*, 120 Ariz. at 191, 584 P.2d at 1182; *see* C.F. Phillips, Jr., *The Regulation of Public Utilities* at 394 (3d ed. 1993). The Commission has discretion in determining a utility's capital structure. *See Citizens Utilities Company, id.*

With this background, we turn to LPSCO's argument that the Commission, after properly excluding the unused portion of the sewage plant from the sewage-treatment plant's rate base, went on improperly to exclude the unused portion of the plant a second time when calculating its capital structure, specifically that the plant consisted of 51.8 percent equity. LPSCO argues that such treatment was mathematically improper and resulted in compounding an exclusion that should only have occurred once.

LPSCO has asserted but failed to explain, either in its appellate briefs or at oral argument, why the Commission's approach was mathematically incorrect. To the contrary, it appears reasonable that the unused portion of the sewage-treatment plant, if removed from the rate base, should also be removed when determining the equity component which cost is relevant to determining a fair rate of return.

■ LPSCO next insists that the Commission's methodology was unsupported by the evidence. This argument is asserted in conjunction with LPSCO's contention that the second rate-of-return adjustment in decision 57944 is "unprecedented" and arbitrary.

Neill Dimmick, a consultant hired by the City of Litchfield Park to analyze LPSCO's rate application, testified that the portion of the sewage plant found not to be used and useful in providing utility service should be treated as being funded with equity capital and eliminated from the weighted cost of capital. He stated that such an adjustment would insure that the risk of unused property would be sustained by LPSCO's shareholders and not the ratepayers. Correspondingly, the hearing officer recommended using the

---

useful, plus a proper allowance for working capital and including all applicable pro forma adjustments. Contributions and advances in aid of construction, if recorded in the accounts of the public service corporation, shall be increased to a reconstruction new basis." A.A.C. R14–2–103(A)(3)(n).

3. There is no required formula for this determination. *E.g., United Railways & Electric Company of Baltimore v. West*, 280 U.S. 234, 249–50, 251, 50 S.Ct. 123, 125, 125–26, 74 L.Ed. 390 (1930); *Simms v. Round Valley Light & Power Company*, 80 Ariz. 145, 154, 294 P.2d 378, 384

(1956). The Commission simply considers all relevant factors, including: (1) comparisons with other companies having corresponding risks, (2) the attraction of capital, (3) current financial and economic conditions, (4) the cost of capital, (5) the risks of the enterprise, (6) the financial policy and capital structure of the utility, (7) the competence of management, and (8) the company's financial history. C.F. Phillips, Jr., *The Regulation of Public Utilities* at 377 (3d ed. 1993), discussing *Bluefield Waterworks*, 262 U.S. 679, 43 S.Ct. 675, and *Smyth v. Ames*, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898).

actual capital structure of the sewage-treatment plant and excluding that portion of the plant designated for future use. The Commission followed the hearing officer's recommendation; it determined that the plant consisted of 51.8 percent common equity. The capital-structure determination for the sewage-treatment facility is supported by the record.

We also find that, despite the earlier decision in 56362, the Commission's capital-structure determination is not arbitrary. In decision 56362 the Commission approved, without explanation, its staff's acceptance of LPSCO's proposed capital structure for the sewer division of 30.95 percent debt and 69.05 percent equity. In its most recent decision, the Commission recognized that "LPSCO's capital structure was substantially the same at the time of its last rate proceeding," from which decision 56362 ensued. However, the Commission concluded that "the appropriate capital structure can be obtained by using the actual capital structure of each division, with the amount of plant held for future use excluded from the equity capital component," and assigned the sewer division an equity percentage of 51.8.

From the foregoing, it appears that, in decision 57944, the Commission treated differently the sewage-treatment plant for rate-of-return purposes than it did in its previous decision. However, in arriving at the capital structure, the Commission also articulated the following reasonable, non-arbitrary basis for switching methodologies during the sewage-treatment plant's useful life: ·

> This method ... eliminates the calculation of hypothetical expenses and revenues and it protects the ratepayers by not using the cost of equity in the amount of plant held for future use to determine the appropriate cost of capital. The use of a hypothetical capital structure would penalize LPSCO for its debt equity exchange which was approved in the last rate proceeding as being in the interest of the rate payers.

Thus, we do not find that the Commission's methodology was arbitrary.[4]

<hr/>

4. The Commission consistently took this changed position into account when determining the cost

■ LPSCO also contends that the Commission's approach is contrary to a 1979 decision, number 50273, in which the Commission outlined the rate-making treatment of LPSCO's sewage-treatment facility. In that decision, the Commission found that LPSCO proposed to retire its sewage facility and ordered that "50% of the total installed cost" of the new sewage treatment plant would "be considered used and useful property for inclusion in rate base" and that the remaining 50 percent would "be included in rate base proportionate to the percentage of utilization in any given test year." Contrary to LPSCO's interpretation, the decision did not address whether the excluded portion of the plant could be considered in determining the equity component. Accordingly, the Commission did not act contrary to its earlier decision.

LPSCO also contends that the Commission is precluded by the doctrine of res judicata from adjusting the equity component to exclude from equity that portion of the sewer plant not used or useful because it did not do so in earlier decisions 50273, 52874 and 56362. Given the absence of cited authority, however, we decline to consider this contention. *See Coggins v. Wright,* 22 Ariz.App. 217, 219, 526 P.2d 741, 743 (1974); *see also State Farm Mutual Automobile Insurance Company v. Novak,* 167 Ariz. 363, 370, 807 P.2d 531, 538 (App.1990); Ariz.R.Civ.App.P. 13(a)(6).

### B. Water Division—Cost of Equity

■ LPSCO challenges the rate of return for its water division by specifically alleging that the 10.1 percent cost of equity assigned by the Commission is not supported by substantial evidence. This assignment permitted LPSCO a 6.5 percent rate of return on fair value rate base for its water division.

Without offering any mathematical or other analytical support, LPSCO sought for its water division a cost of equity of 14 percent. Commission staff recommended a cost of 11.5 percent for both divisions of the utility, which it formulated from averaging four comparable earnings and four discounted-cash-flow

<hr/>

of equity and the income tax expense for the sewer division.

analyses, *see* Phillips, *The Regulation of Public Utilities* at 394–98, giving additional weight to the cash-flow approach to reflect dividend growth and also accounting for LPSCO-specific risks such as volatility of earnings and size. The discounted-cash-flow analysis produced a range of equity costs from 9.4 percent to 12.4 percent; the comparable earnings approach yielded a range from 10.6 percent to 12 percent. While it authorized the requested percentage for LPSCO's sewer division, the Commission stated that, because LPSCO entirely funded its water division with equity capital, there was no interest expense to reduce the investors' return, which, in turn, translated to reduced risk. The Commission consequently reduced LPSCO's cost of equity to 10.1 percent by accepting the average of the low range of staff's discounted-cash-flow and comparable-earnings analyses.

As has been discussed above and in *Sun City Water Company*, "[t]he cost of equity capital is not capable of such mathematical precision [as determining debt cost] and in fact is a judgment call, enlightened by consideration of all the relevant factors." 26 Ariz.App. at 309, 547 P.2d at 1109. Given this discretion, we are not convinced that it was abused when the Commission adjusted downward LPSCO's cost of acquiring equity capital for its water division to reflect reduced investor risk from its equity-rich plant. Indeed, the lowest equity cost calculated by the staff, with which LPSCO did not take exception, was 9.4 percent. Accordingly, we affirm that portion of the Commission's order assigning a 10.1 percent cost of equity to LPSCO's water division.

### C. Exclusion of Well 23A From Rate Base

 LPSCO next asserts that the Commission arbitrarily excluded Well 23A, a replacement for Town Well 1 retired by LPSCO during the test year and determined previously by the Commission to be used and useful, from its fair value rate base for its water division, effectively assigning it a zero fair value. The Commission responds that Well 23A properly was excluded from the rate base because it was not necessary to serve LPSCO's customers.

Town Well 1 was drilled and in use since 1946. It was removed from service in March 1990, three months into the test year, and retired the following summer. The construction of its replacement, Well 23A, began in 1991 and the well was fully operational in June 1992. Gerald Ellsworth, LPSCO's manager, testified that the water plant facilities, without Town Well 1 or its replacement, adequately met the needs of LPSCO's existing customers. He further stated that any plant additions were driven by SunCor's development. Ellsworth later agreed that Well 23A is not "absolutely essential to serve [LPSCO's] existing customers."

Dimmick testified that he recommended including out-of-test-year revenues to reflect a significant customer increase, and correspondingly proposed the recognition of Well 23A. He stated, however, that if these extra revenues were not included, Well 23A was not necessary for ratemaking purposes.

The Commission staff conducted its site inspection on January 31, 1992. It concluded that, as of that date, Well 23A lacked a pump and was not used and useful.

In decision 57944, the Commission agreed with its staff's removal of $218,000 from the rate base for construction work in progress ("CWIP") on Well 23A because the well was not used or useful during the test year. The Commission stated:

> To include Well No. 23A in rate base without a corresponding inclusion of new customers and revenues results in a violation of the matching concept implicit in the use of a historical test year. Second, even if the well were in service during the test year, we are not convinced that it is necessary to serve the Company's customers. It is clear that LPSCO has been able to provide service to its customers without Well No. 23A.

 Generally, although CWIP is not included in the rate base because it is not yet part of the fair value of property devoted to public use, *see Arizona Water Company*, 85 Ariz. at 202, 335 P.2d at 414, it is within the Commission's broad discretion to consider a plant under construction in determining a utility's fair value. *Arizona Corporation*

*Commission v. Arizona Public Service Company*, 113 Ariz. 368, 371, 555 P.2d 326, 329 (1976). Although the Commission properly could have considered the cost of Well 23A, construction of which was subsequent to the test year, *see id.*, the record does support the Commission's exclusion of the construction of this well from the rate base. LPSCO has not cleared its hurdle on review of a satisfactory demonstration that the Commission acted unreasonably or unlawfully in determining LPSCO's just and reasonable rates.

### D. Income Tax Expense

■ LPSCO next submits several theories that the Commission unlawfully determined its income tax expense by treating the sewage and water portions as separate, non-affiliated corporations. The Commission treated the sewage-treatment and water divisions as separate entities for the calculation of LPSCO's income tax expense. The parties have referred to this separate treatment in the briefs as a "stand-alone" approach. Although the Commission recognized that, in past decisions, it had combined the two operations for the purpose of determining such expenses, it stated that its current approach "more accurately represents the expense associated with providing each type of service." Accordingly, it made a downward adjustment of $4383 to income tax expense for the water division and increased the expense for the sewer division by $2928. LPSCO submits that these adjustments understated LPSCO's income tax expense attributable to its utility operations.

■ LPSCO contends that the hearing officer, at the hearing's conclusion, directed the parties to address any contested issues in their post-hearing briefs or waive consideration. It further maintains that, because the Commission staff did not discuss separate tax treatment in its post-hearing opening brief or after LPSCO "dutifully" raised this issue in its opening brief, it has waived consideration of its position on this issue. We disagree.

Following the hearing, the hearing officer established the briefing schedule and mentioned that the briefs should "include identification of all issues and agreement or disagreement of both parties' position on those

issues." However, the hearing officer did not indicate that the failure to include an issue would bar it from consideration and we know of no such requirement. In its post-hearing reply brief, the Commission staff, contrary to LPSCO's assertion, did discuss taxing each division as a separate entity in response to LPSCO's proposed method.

■ LPSCO asserts that the Commission is barred by principles of res judicata from deviating from its past treatment of the sewer and water divisions as a consolidated entity. LPSCO has provided no legal authority in support of this assertion, however, and we decline to consider it. *See Coggins,* 22 Ariz. App. at 219, 526 P.2d at 743; *see also State Farm Mutual Automobile Insurance Company,* 167 Ariz. at 370, 807 P.2d at 538; Ariz.R.Civ.App.P. 13(a)(6).

LPSCO further maintains that it is entitled to have its rates based on the full amount of income tax expense attributable to the utility's operation and that the stand-alone approach attributes less income taxes than incurred by the sewer and water plants. LPSCO has not, however, supported this contention with any evidence that the stand-alone computation method denies it a fair return on the fair value of its property. Instead, James Rolle, a utility auditor for the Commission who examined LPSCO, testified that, as a combined operation, Pinnacle West, LPSCO's parent company, had net operating losses and incurred no income tax expense at all.

LPSCO next challenges as unlawful the Commission's tax determination because it is not supported by substantial evidence. Again, we disagree. Rolle testified that "[n]either LPSCO [n]or SunCor file[s] consolidated returns, it is Pinnacle West that does so and Pinnacle West has net operating losses and is not paying any income taxes." Although LPSCO emphasizes the expertise of Dan Neidlinger, its expert, Rolle's testimony supports the decision of the Commission.

■ LPSCO finally submits that the Commission's income tax expense determination is arbitrary because the Commission cites no instance in which this method was used and indeed acknowledges its deviation from prior LPSCO rate applications. We accept that the Commission has broad au-

thority to prescribe classifications for rate-making purposes and that the category of income tax expense is but one classification it may consider. *Consolidated Water,* 178 Ariz. at 481, 875 P.2d at 140. In the present case, the Commission justified its use of the stand-alone method to calculate LPSCO's income tax expense as the more accurate approach. Other methods may not have permitted LPSCO any adjustment for income tax expense. We are not at all convinced that the Commission's treatment of LPSCO's income tax expense is unlawful or unreasonable.

### E. Sewer Division—Depreciation Expense

▮ LPSCO finally maintains that the Commission, which purportedly underestimated LPSCO's annual depreciation expense for its sewer division by $12,264, did not support its decision with substantial evidence and thus was arbitrary and capricious. LPSCO requests a depreciation rate of 4.1 percent.[5] It further inquires whether the Commission's decision allows it to maintain a depreciation account within the meaning of A.R.S. section 40–222.

In the 1989 decision which resulted from LPSCO's previous rate application, the Commission reinstated a previous three percent rate of depreciation for the water and sewer divisions. In doing so, it said that the parties did not submit quantitative evidence supporting the former five percent rate and that it had "greater confidence" in the historical accuracy of the three percent rate. The Commission ordered LPSCO to file in its next application for each division an account-by-account depreciation study and a comprehensive cost-of-service study.

In the present decision, the Commission reported that LPSCO did not submit the ordered studies and, for the sewer division, it instead used rates from a 1981 depreciation study. The Commission concluded that, in the absence of an account-by-account depreciation study, it would keep in effect for both divisions the three percent rate.

LPSCO has not provided further argument nor authority in support of its assertion that the three percent depreciation rate might not permit it to comply with section 40–222.[6] Thus we decline to address this concern. *See* Ariz.R.Civ.App.P. 13(a); *Novak,* 167 Ariz. at 370, 807 P.2d at 538.

As to the propriety of the three percent rate of depreciation for the sewer division, the Commission's decision is supported by the record. Despite testimony from LPSCO's expert that a three percent depreciation rate would significantly underestimate LPSCO's depreciation expense based on generally accepted norms for the expected physical life of its wastewater plant, Rolle testified that, in the absence of a depreciation study, the staff would continue to use the three percent composite rate which appeared in LPSCO's books. The next day, during cross-examination, he similarly said that he interpreted Commission decision 56362 as requiring a new depreciation study and that, without one, it was best to continue with the three percent rate. Although LPSCO complains that the Commission provided no direction as to how the depreciation rates were to be developed, it has failed to show clearly and convincingly that this rate is unlawful or unreasonable.

### CONCLUSION

The Commission's decision is affirmed.

LANKFORD, P.J., and FIDEL, J., concur.

---

5. Depreciation rate is defined as "the percentage rate applied to the original cost of an asset to yield the annual provision for depreciation." A.A.C. R14–2–102(A)(4). Depreciation is "an accounting process which will permit the recovery of the original cost of an asset less its net salvage over the service life." A.A.C. R14–2–102(A)(3).

6. Section 40–222 provides that "[t]he commission may, after hearing, require public service corporations to carry a proper and adequate depreciation account.... It may ascertain and fix the proper and adequate rates of depreciation of the several classes of property for each, and each corporation shall conform its depreciation accounts to the rates so ascertained and fixed, and shall set aside the money so provided for out of earnings and carry such money in a depreciation fund...."