IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

_____

ARIZONA PUBLIC SERVICE COMPANY,
*Appellant*,

v.

ARIZONA CORPORATION COMMISSION,
*Appellee*,

_____

SIERRA CLUB and RESIDENTIAL UTILITY CONSUMER OFFICE
*Intervenors*.

No. 1 CA-CC 21-0002
FILED 3-7-2023

_____

Appeal from the Arizona Corporation Commission
No. E-01345A-19-0236

**AFFIRMED IN PART; VACATED IN PART; AND REMANDED IN
PART**


COUNSEL

Osborn Maledon, PA, Phoenix
By Mary R. O'Grady, Joseph N. Roth, John S. Bullock
*Co-Counsel for Appellant*

Gibson Dunn & Crutcher, LLP, Washington DC
By William S. Scherman, Thomas G. Hungar, Jeffrey M. Jakubiak,
Matthew S. Rozen
*Co-Counsel for Appellant*

Arizona Corporation Commission, Phoenix
By Robin R. Mitchell, Maureen A. Scott, Wesley C. Van Cleve,
Samantha Egan, Stephen Joseph Emedi, Katherine Kane
*Counsel for Appellee*

Radix Law, PLC, Scottsdale
By Andrew M. Kvesic
*Co-Counsel for Intervenors Residential Utility Consumer Office*

Residential Utility Consumer Office, Phoenix
By Daniel W. Pozefsky
*Co-Counsel for Intervenors Residential Utility Consumer Office*

The Sierra Club, Oakland, CA
By Louisa Eberle, Rose Monahan, Michelle Endo
*Co-Counsel for Intervenors The Sierra Club*

**OPINION**

Judge James B. Morse Jr. delivered the opinion of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Michael J. Brown joined.

**M O R S E**, Judge:

¶1        Arizona Public Service Company ("APS") appeals the Arizona Corporation Commission ("Commission") ratemaking Decision No. 78317's ("Decision") determination of the fair value increment ("FVI"), return on equity, and disallowance of investments associated with the installation of Selective Catalytic Reduction equipment ("SCR"). We affirm the Commission's FVI determination as a proper exercise of the Commission's

discretion. Similarly, we affirm the Commission's discretionary base return on equity determination but vacate the 0.2% reduction because the Commission's use of customer-service metrics exceeded its rate-making authority. We also vacate and remand the Commission's SCR investment disallowance because the Commission failed to consider APS's contractual obligations, and improperly considered post-investment data, in violation of the applicable regulation.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2**        APS is a public service corporation owned and operated by the Pinnacle West Capital Corporation, a private company. The Commission is a constitutional entity, empowered to set rates for public service corporations. *See Sun City Home Owners Ass'n v. Ariz. Corp. Comm'n*, 252 Ariz. 1, 4-5, ¶¶ 14-16 (2021).

**¶3**        The Four Corners Power Plant ("Four Corners") is a five-unit, coal-fired power plant. Before 2012, APS owned and operated Four Corners with Southern California Edison ("SCE"), Tucson Electric Power, Public Service Company of New Mexico, El Paso Electric Company, and Salt River Project.

**¶4**        In 2006, California passed a law prohibiting utilities from extending the life of an existing fossil fuel plant, requiring SCE to divest its ownership in Four Corners. As a result, APS sought the Commission's approval to purchase SCE's ownership share of Four Corners' Units 4 and 5 and retire Units 1 through 3. In response, the Commission issued Decision 73130, authorizing APS to purchase SCE's share of Four Corners.

**¶5**        In 2013, APS closed the purchase of SCE's interest in Four Corners and requested the Commission's permission to include the acquisition costs in its rates. On December 12, 2014, the Commission issued Decision 74876, finding the acquisition costs prudent and allowing APS to include these costs, and a reasonable return, in its rate base.

**¶6**        In August 2015, APS entered a consent decree with the United States Environmental Protection Agency, in which APS agreed to install SCRs at Four Corners. Later that month, APS entered into an SCR construction agreement with Four Corners' co-owners. The next month, construction on the SCRs began. Six months later, contractors began installing the SCRs' structural steel. In January 2017, contractors began installing the SCRs' reactors.

**¶7** In December 2017, APS completed construction on Unit 5's SCR. Five months later, APS completed construction on Unit 4's SCR. The SCR installation took two years and seven months.

**¶8** During the construction, APS began a rate case. In 2017, the Commission issued Decision 76295, approving a settlement agreement to resolve that rate case. The agreement allowed APS to request SCR installation costs. In April 2018, APS requested these costs as part of the rate base. Seven months later, the Commission's Administrative Law Judge ("ALJ") issued a Recommended Opinion and Order. The Commission did not approve this recommendation and instead directed APS to begin a new rate case.

**¶9** In October 2019, APS initiated the current rate case. The Sierra Club and the Residential Utility Consumer Office ("RUCO") intervened. Before the hearing, APS announced that it planned to retire Four Corners by 2031, instead of 2038. On January 14, 2021, the hearing began. It spanned 26 days, involved 47 parties, and led to a 457-page Recommended Opinion and Order. Weeks after the hearing, APS announced that it would transition one Four Corners unit to seasonal use. Over eight days, the Commission held an open meeting to consider the Recommended Order and Opinion. Following the open meeting, the Commission amended the recommendation and issued the Decision. In the Decision, the Commission determined APS's return on equity, FVI, and fair value base rate. Two of the five Commission members dissented. The Commission then used this data to calculate APS's "fair value rate of return."

**¶10** On November 24, 2021, APS petitioned for rehearing. By operation of law, the Commission denied the petition. APS sought appeal with this Court. We have jurisdiction under A.R.S. § 40-254.01.

## DISCUSSION

**¶11** "A utility is entitled to a fair rate of return on the fair value of its property, 'no more and no less.'" *Litchfield Park Serv. Co. v. Ariz. Corp. Comm'n*, 178 Ariz. 431, 434 (App. 1994) (quoting *Ariz. Corp. Comm'n v. Citizens Utils. Co.*, 120 Ariz. 184, 190 n.5 (App. 1978)); *see Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 692-93 (1923). A "determination of fair value is necessary with respect to a public service corporation." *US W. Commc'ns, Inc. v. Ariz. Corp. Comm'n*, 201 Ariz. 242, 245, ¶ 12 (2001). The Commission "is required to find the fair value of the company's property and use such finding as a rate base for the purpose of

4

calculating what are just and reasonable rates." *Id.* at ¶ 15 (quoting *Simms v. Round Valley Light & Power Co.*, 80 Ariz. 145, 151 (1956)). The fair-value determination is within the Commission's discretion because our "constitution does not establish a formula for arriving at fair value" and our supreme court has never "prescribed one." *Residential Util. Consumer Off. v. Ariz. Corp. Comm'n*, 240 Ariz. 108, 112, ¶ 15 (2016).

**¶12** "The Commission's ratemaking authority under article 15, section 3 is plenary." *Johnson Utils., L.L.C. v. Ariz. Corp. Comm'n*, 249 Ariz. 215, 221, ¶ 21 (2020). "Because the Commission exercises quasi-judicial powers, we defer to its findings of facts and may disturb its decision only if" the party challenging the decision proves by clear and convincing evidence that "it is arbitrary, unlawful, or unsupported by substantial evidence." *Sun City Home Owners Ass'n*, 252 Ariz. at 5, ¶ 17; *Freeport Mins. Corp. v. Ariz. Corp. Comm'n*, 244 Ariz. 409, 411, ¶ 6 (App. 2018) (quoting *Litchfield Park Serv. Co.*, 178 Ariz. at 434); *see* A.R.S. § 40-254.01(E). Moreover, "the Commission's decisions are entitled to a presumption of constitutionality." *Sun City Home Owners Ass'n*, 252 Ariz. at 5, ¶ 17.

**¶13** APS argues the Commission acted unlawfully, arbitrarily, and without substantial evidence when it (1) established a 0.15% return on the FVI; (2) established an 8.7% return on equity; and (3) disallowed $215.5 million of SCR capital investment, as part of the rate base.

## I.   0.15% Return on FVI.

**¶14** The FVI is the amount by which the value of APS's assets exceeds those assets' original costs. Along with setting a rate of return on the "original cost," the Commission sets the FVI as part of determining the fair value of the public service corporation's properties. A.A.C. R14-2-103(A)(3)(e), (h). APS argues that Commission Staff acknowledged that "the Commission has consistently used the risk-free rate of return as the basis for calculating the return on FVI to properly satisfy AZ law." The risk-free rate is the return offered by an investment that carries zero risk and is traditionally tied to Treasury bonds. *See* Thierry J. Sénéchal & John Y. Gotanda, *Interest as Damages*, 47 Colum. J. Transnat'l L. 491, 523 (2009). APS contends the Commission's practice has been to set the return on FVI at half the risk-free rate. APS argues that the Commission departed from that past practice, and acted arbitrarily, capriciously, and without substantial evidence when it set the FVI at 0.15%.

**¶15** To support its argument, APS points to two prior Commission decisions. But neither reflects a practice of setting the FVI at

half the risk-free rate. In the first decision, the company recommended a FVI of 2.05% and Commission Staff recommended a FVI of 1.25%, which it calculated as half the risk-free rate. *In re Application of Southwest Gas Corp.*, Docket No. G-01551A-07-0504, Decision No. 70665 at 31 (Ariz. C.C. Dec. 24, 2008). The Commission accepted the staff's analysis but rejected the recommended FVI. *Id.* Instead, the Commission reduced the company's FVI to 1.0%, less than half of the risk-free rate, which it concluded "properly accounts for the effect of inflation." *Id.* at 32. In the second decision, the Commission accepted a negotiated FVI of 0.5%, less than half of the risk-free rate, after most of the parties reached a consensus on the appropriate rate. *In re Application of UNS Elec., Inc.*, 331 P.U.R.4th 250, 2016 WL 4467959, at *12-15 (Ariz. C.C. Aug. 18, 2016).

**¶16**　　　As recognized by Commission Staff, the Commission has used the risk-free rate to assist in setting the FVI. But in neither of the decisions cited by APS did the Commission set the FVI at half the risk-free rate. And, in other cases in which the Commission set the FVI at half the proposed risk-free rate, it exercised its discretion rather than following an established practice. *Compare In re Application of Southwest Gas Corp.*, 2020 WL 8024093, at *54-55 (Ariz. C.C. Dec. 17, 2020) (adopting a FVI that was half RUCO's proposed risk-free rate), *with In re Application of EPCOR Water Ariz., Inc.*, 2022 WL 493391, at *73, *76 (Ariz. C.C. Feb. 1, 2022) (setting a FVI at less than half of Commission Staff's risk-free rate); *see Ariz. Corp. Comm'n v. Ariz. Pub. Serv. Co.*, 113 Ariz. 368, 370 (1976) (recognizing that the Commission has a "range of legislative discretion" in exercising its rate-making authority (quoting *Simms*, 80 Ariz. at 154)).

**¶17**　　　The parties presented the Commission with varying positions on the FVI. APS initially recommended a FVI of 1.00% based on calculating the risk-free rate at 1.41%, 2.72%, and 2.52% in three scenarios. APS argued that the appropriate return on FVI would fall between the risk-free rate and APS's recommended return on equity because an investor would expect a return that at least exceeds the risk-free rate.

**¶18**　　　The Federal Executive Agencies ("FEA") used the same three scenarios as APS, and calculated the risk-free rate at 1.09%, 1.85%, and 0.95%. FEA then averaged the calculations to determine a risk-free rate of 1.3%, which it halved to reach a proposed FVI of 0.65%.

**¶19**　　　RUCO recommended a FVI of 0.0%, arguing that FVI represents inflation, not an investment, and allowing a FVI on investments previously made is unfair for ratepayers. Despite this recommendation, RUCO calculated a risk-free rate of 0.28% based on the 2021 fourth quarter

consumer price index inflation projection of 1.3% and subtracted that from the 2021 second quarter nominal risk-free rate of 1.58%, for 30-year Treasury bonds.

¶20 Commission Staff argued that FVI is inconsistent with financial theory because it does not rely on investor financing and that this return should instead be accounted for through APS's cost of capital. Commission Staff concluded that APS and FEA's use of the real risk-free rate would double the inflation rate. Thus, Commission Staff initially recommended a FVI of 0.0%. Despite this position, Commission Staff calculated a risk-free rate using a 2.0% inflation rate, which staff derived from the Bureau of Labor Statistic's consumer price index, then deducted that interest rate from a 2.6% nominal risk-free rate based on the staff's calculation of the 2019 rate of return (yield) on long term Treasury securities. Commission Staff then concluded that "any value between 0.0% and 0.6% could be used as the cost rate on the FVI" and ultimately recommended a FVI of 0.30%.

¶21 The Commission accepted the non-APS parties' arguments that a FVI return does not represent an investment of capital. Noting that "FVI represents the inflation recognized in the [Reconstruction Cost New Depreciated Rate Base]," the Commission concluded that it was not required to produce a positive FVI under the fair value standard because "if a positive return on FVI is awarded, the risk for investors in an Arizona utility is decreased." The Commission then concluded that increasing FVI would be challenging for ratepayers. Based on these conclusions, the Commission reduced the staff's recommendation by half, setting a return on FVI of 0.15%. The Commission based its decision on the parties' economic arguments and sought to fulfill its duty to set "just and reasonable rates . . . that are fair to both consumers and public service corporations." *Phelps Dodge Corp. v. Ariz. Elec. Power Coop., Inc.*, 207 Ariz. 95, 106, ¶ 30 (App. 2004) (internal quotation marks omitted). Such balancing necessarily represents a judgment call that the Commission, and not this Court, is best suited to make. *See Litchfield Park Serv. Co.*, 178 Ariz. at 437 (weighing economic factors constituted a judgment call within the Commission's discretion); *cf. also Qwest Corp. v. Ariz. Corp. Comm'n*, 496 F. Supp. 2d 1069, 1075 (D. Ariz. 2007) (observing that a court is not "a surrogate public utilities commission to second-guess the decisions"). Thus, APS has not clearly and convincingly demonstrated that the Commission's adoption of the 0.15% FVI was arbitrary, capricious, or unsupported by substantial evidence. *See Litchfield Park Serv. Co.*, 178 Ariz. at 434.

## II.     Return on Equity.

**¶22**          The return on equity is one of two "original cost" components that form a utilities rate base. *See* A.A.C. R14-2-103(A)(3)(h); *see also Litchfield Park Serv. Co.*, 178 Ariz. at 435 (describing the difference between return on equity and return on debt calculations). The Commission must make a discretionary "judgment call" to determine the return on equity, after considering all relevant factors. *Litchfield Park Serv. Co.*, 178 Ariz. at 437 (quoting *Sun City Water Co. v. Ariz. Corp. Comm'n*, 26 Ariz. App. 304, 309 (1976), *vacated on other grounds by* 113 Ariz. 464 (1976)). The Commission first determined that an 8.9% baseline return on equity was appropriate and then reduced that baseline amount by 0.2% based on the Commission's concerns about APS's customer service.

**¶23**          We first address the 8.9% baseline. APS argues the Commission's baseline return on equity calculation was arbitrary and not supported by substantial evidence because the Commission relied on RUCO's faulty analysis. We disagree. During the rate case, expert witnesses from APS, FEA, Commission Staff, and RUCO provided testimony, with another intervenor deferring to Commission Staff and RUCO's equity determinations.

**¶24**          For their analyses, the parties each selected a proxy group of publicly traded companies. APS's analysis included 14 companies; FEA and Commission Staff used the same proxy group as APS. Even RUCO used a similar proxy group, adopting 12 of the 14 companies identified by APS. Thus, the parties formed a near consensus on the proper proxy group and each used a series of analyses to calculate the proper return on equity. These analyses included a discounted cash flow analysis, a capital asset pricing model ("CAPM") analysis, and a comparable earning analysis. The parties then proposed a single percentage to represent the return on equity, and calculated a series of ranges for each analysis.

**¶25**          To calculate the return on equity, RUCO weighted each of its analyses results, assigning the discounted cash flow and comparable earnings analyses 40% each, assigning CAPM to the remainder. APS argues that RUCO's CAPM analysis drove down RUCO's return on equity calculation. However, RUCO's CAPM range is higher than, or within, the ranges proposed by the other non-APS parties.

**¶26**          RUCO's analysis produced a range between 6.71% and 8.99%, FEA's analysis created a range between 8.31% and 12.16%, and Commission Staff's analysis created a range between 5.7% and 7.9%. Only APS's analysis

produced a higher range (9.54% to 10.42%), but APS acknowledged that it excluded proxy group results lower than 7.0% from its analysis. And while APS is correct that Commission Staff excluded the CAPM analysis from its return on equity calculation, staff acknowledged that those "results should be considered in determining where within the range APS's [return on equity] should fall."

¶27 The Commission heard testimony on the data that supported these analyses, including forward-looking and historical data, credit ratings, risks associated with APS's power generating portfolio, and projected economic outlooks. Based on this testimony, the Commission adopted, as its starting point, RUCO's proposed 8.9% return on equity. Thus, the Commission's adoption of an 8.9% return on equity was not arbitrary, capricious, or unsupported by substantial evidence.

¶28 APS cites *Bluefield* to argue that RUCO's use of historical data in its CAPM analysis renders the Commission's decision arbitrary, capricious, and unlawful. In *Bluefield*, the company's engineer provided a valuation "based on present and past costs of construction," but the Public Service Commission ignored that recommendation and set a final figure based "substantially on the basis of actual cost," almost cutting the company's valuation in half. *Bluefield*, 262 U.S. at 692. This cut deprived the company of a return equal to similar businesses, running similar operations, in the same general part of the county. *Id.* at 692-93. If anything, *Bluefield* approved the company's use of "past costs of construction," and we do not read *Bluefield* as creating a categorical ban on the use of historical data in setting valuations. *Id.* at 692. Three of the four recommendations presented to the Commission included historical data, and only APS rejected historical data and emphasized the need to use forward-looking inputs and assumptions. Thus, APS has not clearly and convincingly demonstrated that the Commission's use of historical data was arbitrary, capricious, or unsupported by substantial evidence. *See Litchfield Park Serv. Co.*, 178 Ariz. at 434; *see also Sierra Club – Grand Canyon Chapter v. Ariz. Corp. Comm'n*, 237 Ariz. 568, 575, ¶ 22 (App. 2015) ("Substantial evidence is evidence which would permit a reasonable person to reach the Commission's result.").

¶29 Second, APS argues the Commission's 0.2% reduction was unlawful. We agree. At oral argument, the Commission argued its inherent authority to protect ratepayers empowers it to mimic competition and reduce the return on equity to reflect APS's customer service performance. The Commission points to article 15, section 3 of the Arizona Constitution to support its position. However, "the text of the constitution itself limits

the Commission's exclusive ratemaking powers to ascertaining the 'fair value' of [public service corporations] and prescribing classifications, rates, and charges." *Johnson Utils.*, 249 Ariz. at 226-27, ¶ 50. And "[n]either the text of section 3, the records of the Arizona Constitutional Convention, nor our prior caselaw state that we must defer to the Commission's interpretation of its own ratemaking authority." *Id.* at 227, ¶ 52.

**¶30**        Our supreme court differentiated between "the Commission's authority to 'prescribe just and reasonable classifications . . . rates and charges' for [public service corporations]" and "the Commission's power to regulate [public service corporations] to protect the health, safety, comfort, and convenience of their customers, employees, and the public." *Id.* at 220-21, ¶ 19 (alterations in original). "The Commission's permissive authority is distinct from, and unrelated to, its ratemaking powers." *Id.* at 222, ¶ 27 (citing *Ariz. E. R.R. Co. v. State*, 19 Ariz. 409, 414-15 (1918)). "Under the permissive clause, the Commission has authority to regulate [public service corporations] to preserve and protect public health, safety, convenience, and comfort." *Id.* at ¶ 26. Conversely, there "is no evidence indicating that the framers envisioned the Commission's ratemaking authority as including management decisions about the structure or organization of a [public service corporation]." *Id.* at 226, ¶ 50.

**¶31**        The Commission adopted RUCO's 8.9% return on equity as the proper calculation, then proceeded to reduce that rate by 20 basis points. As justification, the Commission points to "deficiencies in APS's customer service performance," including errors with APS's "Rate Comparison Tool," which resulted in a consent decree with the Arizona Attorney General. These customer service concerns are management decisions of a public service corporation subject to regulation through the Commission's permissive authority, not its ratemaking authority. *See id.* at 222, ¶ 26. And the Commission exceeded its ratemaking authority by reducing APS's return on equity based on customer service complaints. *See id.* at 226, ¶¶ 45-47 (disapproving the court's interpretation of the Commission's ratemaking authority in *Ariz. Corp. Comm'n v. State ex rel. Woods*, 171 Ariz. 286 (1992)). As part of its ratemaking function, the Commission was limited to ascertaining APS's "fair value" and using that to "prescribe[] classifications, rates, and charges." *Id.* at 226-27, ¶ 50; *see Simms*, 80 Ariz. at 151 ("While our constitution does not establish a formula for arriving a[t] fair value, it does require such value to be found and used as the base in fixing rates. The reasonableness and justness of the rates must be related to this finding of fair value."). Thus, we vacate the Decision's 0.2% reduction as beyond the Commission's ratemaking authority.

### III. Disallowance of the SCR Capital Investment.

**¶32**        To calculate the rate base, the Commission must determine the "original cost rate base," which is an "amount consisting of the depreciated original costs, prudently invested, of the property . . . at the end of the test year, used or useful . . . ." A.A.C. R14-2-103(A)(3)(h). The Commission argues that, pursuant to this rule, it can exclude property from the original cost rate base if it determines such property was imprudently invested, and not used or is not useful.[1] The Commission determined that APS acted imprudently by investing $215.5 million installing SCRs. APS challenges that decision. APS argues that the Commission misapplied its regulation because it based the disallowance on the closure of Four Corners.

**¶33**        The Commission classifies prudent investments as "[i]nvestments which under ordinary circumstances would be deemed reasonable and not dishonest or obviously wasteful . . . at the time such investments were made." A.A.C. R14-2-103(A)(3)(l). Investments are presumed prudent unless rebutted with "clear and convincing evidence." *Id.* We review interpretations of the Commission's regulations de novo. *Sun City Home Owners Ass'n*, 252 Ariz. at 5, ¶ 18; *Sierra Club – Grand Canyon Chapter*, 237 Ariz. at 573, ¶ 14.

**¶34**        APS argues it was committed to funding the SCR construction by 2015, when it entered into the SCR construction agreement. Sierra Club argues that the prudency determination must be made using information that was known, or should have been known, when each investment is made, i.e., each time a public service corporation spends money. However, during oral argument, the Commission stated that the prudency determination must be made when the project is completed. But the Commission also acknowledged during oral argument that it conducted the prudency evaluation based on information from 2018 or later, after APS completed construction on the SCRs. Under A.A.C. R14-2-103(A)(3)(l), the Commission must determine whether the investments are prudent "at the time such investments were made." By 2018 all the investments had been

---

[1]        Our supreme court has held that the Commission "must find the fair value of the properties devoted to the public use, and . . . cannot be guided by the prudent investment theory." *Ariz. Corp. Comm'n v. Ariz. Water Co.*, 85 Ariz. 198, 203 (1959). No party cited that case to argue the constitutionality of a prudence requirement or challenged the "prudently invested" requirement in A.A.C. R14-2-103(A)(3)(l). Thus, we do not address this issue.

made. Thus, using information from 2018 as the basis for disallowance was in violation of the Commission's regulation.

¶35 As justification for the disallowance, the Commission points to Four Corners' early closure. Yet APS did not announce that it was closing Unit 5 and transitioning Unit 4 to seasonal use until January 2020. The Commission stated that "all indications were that the SCRs would provide approximately a cumulative 484 months of service" but with "the now planned retirement date of 2031 as well as the change to seasonal operations in fall 2023, the SCRs will only provide approximately a cumulative 259 months of service," concluding that it would disallow $215.5 million "based on the early (2031) retirement of the SCRs." But this information was not available until after installation had been completed. Under its own regulation, the Commission could not disallow the SCR investment as imprudent based on Four Corners' closure.

¶36 The Commission accepted Sierra Club's argument, reasoning "a utility has a duty to monitor the economics of its investments in a project from the inception of the project and until the project is completed and that each investment made along the way is subject to a prudency determination." The Commission also stated, "a utility has a duty to alter its choices and its course for a project if doing so makes sense economically and is in the public interest, even if altering the course may not be as advantageous to the utility's shareholders as completing the project would be." However, the Commission must support its decision with substantial evidence. *Sun City Home Owners Ass'n*, 252 Ariz. at 5, ¶ 17.

¶37 Even if we were to accept the Commission and Sierra Club's formulation of prudency, the record does not include any evidence showing whether APS could cancel the SCR construction contract or how canceling that agreement would have impacted APS's finances or its existing contractual obligations to Four Corners' partners. Absent such evidence, the record cannot support a finding that APS violated a duty to alter the course of the project "if doing so makes sense economically and is in the public interest." While the Commission points to some evidence related to its Decision, that evidence is focused on information available after "the time such investments were made." A.A.C. R14-2-103(A)(3)(l). For example, the Commission states that purchase power agreement prices for solar and wind had fallen between 2009 and 2019; that Palo Verde market prices were low in 2019 and expected to stay low through 2029; and that natural gas prices at the "SoCal Border Hub" have declined substantially since 2008 and are expected to stay low through 2029. But because all those examples include evidence from after the SCR

construction was completed in 2018, the Commission did not point to evidence showing the environment that existed "at the time such investments were made," as the Commission's regulations require. A.A.C. R14-2-103(A)(3)(l). Thus, we vacate the SCR disallowance portion of the Decision and remand to the Commission for further proceedings consistent with the Commission's regulations and this opinion.

## CONCLUSION

**¶38** For the reasons stated above, we affirm the Decision's FVI calculation and 8.9% return on equity determination, vacate the Decision's 20-basis point return on equity reduction, vacate the SCR disallowance, and remand for further proceedings.



AMY M. WOOD • Clerk of the Court
FILED: AA